STATE of Minnesota, Respondent,

v.

Corey Chauncey BRADFORD,
Appellant.

No. C3–99–1298.

Supreme Court of Minnesota.

Aug. 24, 2000.

As Amended on Denial of Rehearing
Oct. 25, 2000.

John M. Stuart, Minnesota Public Defender, Steven P. Russett, Asst. State Public Defender, Minneapolis, for appellant.

Corey Chauncey Bradford, Bayport, pro se.

Michael A. Hatch, Minnesota Atty. Gen., St. Paul, Amy Klobuchar, Hennnepin County Atty., Beverly J. Benson, Asst. County Atty., Minneapolis, for respondent.

Heard, considered, and decided by the court en banc.

## OPINION

PAUL H. ANDERSON, Justice.

A jury found appellant Corey Chauncey Bradford guilty of one count of first-degree murder while committing domestic abuse and one count of first-degree heat-of-passion manslaughter for the 1997 death of Rhonda Overall. The district court convicted Bradford of first-degree domestic abuse murder and sentenced him to life imprisonment.

On appeal from his judgment of conviction, Bradford argues that the district court erred by (1) allowing an expert to testify that Overall's death was domestic abuse murder rather than suicide and that other nontestifying experts agreed with that opinion, (2) admitting evidence seized pursuant to an invalid search warrant, (3) admitting statements by Bradford obtained in violation of his Fifth Amendment rights, (4) violating Bradford's rights under the Confrontation Clauses of the United States and Minnesota Constitutions by admitting hearsay statements made by Overall, (5) accepting inconsistent jury verdicts, and (6) sentencing Bradford for first-degree domestic abuse murder rather than first-degree heat-of-passion manslaughter. In addition, Bradford argues that he is entitled to a new trial because of prosecutorial misconduct during closing argument. Finally, in his pro se brief, Bradford raises two additional issues involving judicial bias in assignment of judges and jury tampering. We affirm.

Shortly after 5 o'clock on the afternoon of September 6, 1997, Minneapolis police officers responded to a 911 call originating from a North Minneapolis duplex rented by Rhonda Overall. The caller stated that Overall had shot herself. Sergeant Gail Cronquist was the first officer to respond to the call. As Cronquist approached the duplex, appellant Corey Bradford came out the front door screaming that "she shot herself" and that she was "in the basement." Cronquist entered the duplex and saw a woman, later identified as the owner of the duplex, standing inside on the telephone with a 911 dispatcher. Cronquist asked the owner where the victim was, and the owner directed Cronquist to the top of the basement stairs located in the kitchen.

Once in the kitchen, Cronquist observed a gun on the top basement stair and, looking down, saw Overall lying face down and nude at the base of the stairs. After going down the stairs, Cronquist was able to ascertain that Overall still had a pulse and observed either extensive bruising or lividity on her body. Overall was then taken from her home and transported to a hospital by ambulance. Overall's pulse stopped en route and she was declared dead at the hospital.

Meanwhile, other police officers arrived at the scene and walked through Overall's home to make sure that it was safe. While doing so, they observed a pair of jeans and panties, a bra, and a pair of shoes strewn in the living room. Also in the living room was a set of keys that included two keys to a gun case, which the officers subsequently observed on a bed upstairs. At this point, the police concluded that Bradford might have standing to object to a search so they decided to obtain a search warrant before seizing any items from the home.

While the other officers were in the home, Bradford told an officer who was outside the home that he was coming out of the bathroom when he heard a loud sound. Bradford stated that he found his girlfriend, Overall, in the basement, and when he tried to turn her over, he discovered that she had been shot. He then called 911. Bradford also told the officer that he had just discovered that Overall had been sleeping with his brother. Bradford then was placed in a police squad car to calm him and to secure him as a witness. While in the car, Bradford began having difficulty breathing. Several officers, concerned about Bradford's welfare, removed him from the car onto the lawn, where he began "throwing himself around and moaning." The officers then called an ambulance, and the paramedics who arrived stated that Bradford was hyperventilating. While Bradford was on the lawn, Cronquist directed other officers to collect Bradford's clothes because she had observed blood on them. After Cronquist gave this direction, Bradford began throwing dirt and grass on his clothes.

Later that same evening, the police interviewed two witnesses who lived nearby. One witness told the police that he heard sirens and then saw a man running out of Overall's home saying, "I shot her; I didn't mean to." The other witness stated that she heard a loud bang and then saw a man running out of Overall's home saying, "I shot her; I shot her." Both witnesses later testified at trial. In addition to con-

ducting these interviews, the police reviewed the medical examiner's preliminary determinations and learned that Overall had bruises and scrapes on her legs, back, and left eye. They also learned that Bradford had assaulted Overall on three prior occasions.

After gathering this additional information, two sergeants from the Homicide Unit began interviewing Bradford at the Homicide Office. The interview began at approximately 8:15 p.m. Following a short introductory exchange, the interview proceeded as follows:

Q. But, before we talk to you about this Cory, you have rights. You have the right to remain silent. Anything you say can be used in court, as evidence against you. You have the right to have an attorney present now or at any time during questioning. If you can't afford an attorney, one will be provided for you without cost.

A. So how long will it take you to get somebody down here while I tell you what happened?

Q. Just a minute. Do you understand your rights as I've just given them to you?

A. Yes I do.

Q. Do you want to talk to us?

A. I wanna talk to you but, I wanna have somebody present.

Q. Ok.

A. Because if its ... if its ... you know what I'm sayin' ... if it's a criminal case against me already then ...

Q. Ok.

A. Fuck ... I didn't do shit. I didn't do shit. [the Sgts. get up to leave] So how long is it gonna take before somebody'l ...

Q. Ok. You're under arrest for probable cause. Within 36 hours of your arrest ...

A. I'll be either charged ...

Q ... or released. And your 36 hours starts Monday morning. Today doesn't count and Sundays don't count. So by Tuesday noon you'll know what's up, ok.

A. Ok. Will they ... If I talk to you now, will they send somebody to talk to me.

Q. Will who send somebody?

A. Ummm, you know, the system I guess.

Q. If you're formally charged and you can't afford to represent yourself ...

A. I can't.

... Then they will appoint someone for you, if you're formally charged.

A. So either way ... so either way it goes I'm gonna sit here until Wednesday?

Q. Tuesday at noon. You will know by Tuesday at noon whether or not you're gonna be charged or released, Cory.

A. Ok, well, I'm gonna tell you what happened.

Q. So, you wanna tell your side of it ...

A. Yeah.

Q .... without an attorney here.

A. Yes.

During the interview, Bradford told the sergeants that earlier that day he had learned that Overall was sleeping with his brother. Bradford stated that he then confronted Overall and the two of them argued, but Bradford denied having hit her, but admits having pulled her hair. After the argument, Bradford stated that he told Overall that he was going to go to the bathroom and then leave with his son. While in the bathroom, he heard a shot, ran out, and found Overall in the basement. He said that he tried unsuccessfully to move her and then called 911. Following the interview, the police took Bradford into custody.

Based on the information they had gathered, one of the interviewing sergeants prepared a warrant application to search Overall's home. The sergeant prepared an affidavit in support of the application. In the affidavit, the sergeant stated:

Your Affiant is a Sgt with the [Minneapolis] Police Dept assigned to the Homicide Unit. Your Affiant received a call to 2535 Polk Street NE, Mpls, on 090797 at approx 1700 hours.

A male caller later ID as Corey Bradford stated that his girlfriend had just shot herself. Squads responded and found the victim lying on the basement floor with a gunshot wound to her head. She later died at [Hennepin County Medical Center].

Based on the above info and the fact that the caller Bradford used to live at 2535 Polk Street NE your Affiant requests permission from the court to enter and search for items listed on one and four of this application to search. In an interview with Bradford he stated in post Miranda that the victim had on a blue [Georgetown] shirt, Girbauo [sic] jeans and panties and they were laying in the living room. He also stated he owned the Toyota parked in back and that his keys will have the gun case keys on the ring.

Using the affidavit, the police obtained a search warrant for Overall's home at approximately 10:30 that evening.

That same evening, after the Minneapolis Bureau of Identification (BI) took initial crime scene photographs, a BI officer recommended requesting Bureau of Criminal Apprehension (BCA) assistance with blood evidence. The BI and the BCA examined the scene the following morning. Evidence gathered pursuant to the search warrant included clothing from the living room (two pairs of shoes, a pair of jeans, panties, socks, and a bra), letters from an upstairs bedroom and a hall closet, photographs from a hall closet and the bedroom, the set of keys, the gun, the gun case, one empty shell casing, five live rounds from

the gun, a bullet removed from the basement stairway, a plastic bag of ammunition, a box of ammunition, and blood samples.

As part of their investigation, the police interviewed members of Bradford's family. Bradford's sister testified that Bradford was at her house on the afternoon of the shooting and that they had argued about money Overall owed to the sister. Bradford's sister grew increasingly angry and told Bradford that Overall had been sleeping with his brother. Shortly thereafter, Bradford left.

The police also spoke with Bradford's aunt, who testified that Bradford called her in St. Louis, Missouri on the afternoon of the shooting. The aunt stated that when Bradford called, he was angry and asked to speak with his brother, who was living with the aunt. When the aunt asked Bradford what was wrong, he said that his brother was sleeping with his "wife." The aunt heard arguing on the telephone, and an angry female voice in the background. Bradford stated, "I'm going to kill her; I'm going to kill her," and asked for his brother. The aunt listened to the ensuing conversation between Bradford and his brother. Bradford's brother denied having slept with Overall, Bradford told his brother that he was going to "mess [him] up," and the call ended.

The medical examiner who performed an autopsy on Overall's body noted a single intraoral gunshot wound with an exit wound on the back of her neck. The examiner concluded that Overall died from the gunshot wound. He also observed numerous bruises on Overall's scalp, left eye, ear, face, abdomen, hands, feet, arms, and legs and abrasions on her left eye, back, shoulders, buttocks, and knees. The examiner concluded that the injury to Overall's left eye was consistent with her having been struck with a fist. At trial, the examiner testified that, in his opinion, Overall's death was a homicide. He further testified that he had consulted with other experts, who agreed with his opinion.

The BCA conducted blood spatter analysis in Overall's home. Based on this analysis, a BCA scientist concluded, and testified at trial, that Overall was shot while standing at approximately the top basement stair, and then she immediately fell down the stairs.

Numerous tests were performed on evidence from the scene. DNA tests revealed semen matching Bradford's DNA on the vaginal and perineal swabs taken from Overall's body and from the underwear found in the living room. DNA tests also revealed that blood from the basement area and on Bradford's clothes was Overall's. Swabs from the back of Overall's hands contained gunshot residue, which was consistent with Overall having either fired a weapon or having been in close proximity to a discharging weapon. Finally, latent fingerprint testing revealed prints from Overall's right index finger on the side of the gun and on the cylinder. No other prints were found on the gun.

On September 9, 1997, Bradford was charged with one count of first-degree intentional premeditated murder, Minn.Stat. §§ 609.185(1), 609.11 (1998), and one count of second-degree intentional murder without premeditation, Minn.Stat. §§ 609.19, subd. 1(1), 609.11 (1998). The Hennepin County Attorney's Office then presented its evidence to the Hennepin County Grand Jury. On October 14, 1997, the Grand Jury indicted Bradford for one count of first-degree intentional premeditated murder, Minn.Stat. §§ 609.185(1), 609.11 (1998), one count of second-degree intentional murder without premeditation, Minn.Stat. §§ 609.19, subd. 1(1), 609.11, and one count of first-degree murder while committing domestic abuse, Minn.Stat. §§ 609.185(6), 609.11 (1998).

Following the indictment, the police interviewed an inmate who was in custody with Bradford in late September and early October 1997. The inmate testified that Bradford told him about Overall's death. Bradford told the inmate that when Over-

all told him she was cheating on him with his brother, he punched and choked her, ran upstairs, got his gun, and shot her at the basement stairs. Bradford stated that he tried to make the shooting look like suicide by standing on Overall's left side, because she was left-handed. He also stated that he tried to put her fingerprints on the gun, but was worried that his fingerprints might be on the gun and that the landlord and a child outside may have heard him screaming, "I shot her."

Prior to trial, the state disclosed to Bradford its intent to offer extensive testimony to prove a pattern of past domestic abuse as an element of the third count—first-degree domestic abuse murder.

At a *Rasmussen* hearing, Bradford moved, in part, to (1) suppress evidence seized from Overall's home on the grounds that the search warrant lacked probable cause and that evidence seized was outside the scope of the search warrant, (2) limit the introduction of allegations of prior domestic abuse because the evidence was highly prejudicial, much of the evidence was hearsay, and it raised a confrontation issue, (3) stipulate to a past pattern of domestic abuse as an element of the third count, and (4) suppress statements Bradford made during his interview at the Homicide Office because they were obtained in violation of his Fifth Amendment right against self-incrimination.

In a subsequent ruling, the district court addressed some, but not all, of Bradford's motions. With regard to Bradford's interrogation, the court found that the two sergeants terminated the interrogation after Bradford unambiguously requested an attorney, but that Bradford then reinitiated the conversation and waived his right to have an attorney present. With regard to the seized evidence, the court found that some of the evidence was admissible under the plain view exception because the police were lawfully on the premises because of tacit consent and exigent circumstances. The court, without deciding whether the affidavit established probable cause, concluded that the remainder of the evidence was admissible under the inevitable discovery exception to the warrant requirement. The court also found that Bradford could stipulate to a pattern of past abuse without the state's permission. The state immediately appealed this determination.

On appeal, the Minnesota Court of Appeals reversed the district court, holding that "while respondent has a right to stipulate to an element of the charged offense, this stipulation does not limit the state's ability to present otherwise admissible relationship evidence, including incidents of domestic abuse, for the purpose of proving the elements of first- and second-degree murder." *State v. Bradford*, C5–98–790, 1998 WL 691033, at *2 (Minn.App. Oct.6, 1998). The court of appeals then remanded the case for trial.

On remand, Bradford's case was assigned to a different judge, who considered the unresolved motions. With regard to the incidents of abuse that the state sought to admit, the court found that two incidents of abuse on July 6, 1996 were admissible under the excited utterance hearsay exception. Further, the court found that Overall's statements made to hospital staff and a social worker following these incidents were statements made for diagnosis and treatment, and therefore also were within a hearsay exception. Likewise, statements that Overall made to a Hennepin County Medical Center neurologist were admissible as statements made for the purposes of diagnosis and treatment. The testimony offered, and eventually given, at trial included described incidents of abuse on the following dates:

*September 29, 1995*: A bystander saw Overall and Bradford arguing in downtown Minneapolis and called 911 when he saw Bradford restraining Overall. Two police officers responded to the 911 call and saw Bradford restraining Overall. They saw Overall break free and Bradford again grab her. When Bradford and Overall saw the officers, Bradford released Over-

all. The officers observed redness on Overall's neck and arrested Bradford for domestic assault.

*July 6, 1996*: Police were dispatched to Overall's apartment for a domestic assault. Once there, an officer noted redness and swelling on Overall's face. Overall told the officer that the father of her youngest child had repeatedly punched her face, kicked her head and torso, and threatened to kill her if she called the police. That evening the police were again dispatched to the apartment. Overall told the police that she had "kicked [Bradford] out" earlier that day, but he returned, punched her, shoved her head into the wall, and took their 5–week–old son. Overall was taken to the hospital by ambulance where a nurse and physician treated her bruises, sutured her lacerations, and photographed her injuries. Overall told a hospital social worker that Bradford had abused her and that he had done it before.

*July 20, 1996*: Overall resided at the Harriet Tubman Shelter for Battered Women from July 21, 1996 to August 5, 1996, as a result of an incident on July 20, 1996. While at the shelter, Overall petitioned for an order for protection. In her verified petition and affidavit, she recounted Bradford's recent death threats and the incidents of July 6, 1996. She also stated that in the previous year, Bradford had punched her, broken her chest bone, ribs, and nose, sprained both of her wrists, caused her to have stitches, pulled her hair, kicked her, pushed her, shoved her, and choked her. At trial, the shelter coordinator testified about her conversation with Overall during the shelter intake process. On July 21, 1996, Overall told the coordinator that Bradford had threatened to kill her and had destroyed everything in her apartment the night before. The district court ordered a temporary order for protection, but vacated the order when neither party appeared for the scheduled hearing.

*October 1, 1996*: A neurologist who examined Overall on this date testified that he saw Overall for neck and back pain and that she related to him that two weeks earlier the father of her children had struck her in the neck and back.

*December 13, 1996*: An emergency room physician testified that he saw Overall for left neck, shoulder, and back pain resulting from an assault two days earlier. During the examination, Overall stated that her boyfriend had pushed her into a wall.

*March 26, 1997*: A police officer testified that he was dispatched to Overall's apartment for domestic assault and that upon arriving at the scene, Overall told him that Bradford had struck her in the mouth.

*August 1997*: One of Overall's co-workers stated that she saw bruises on Overall's left cheek and neck. When the co-worker commented on the bruises, Overall told the co-worker that she "was having some trouble with her boyfriend."

In addition to the above testimony, Overall's brother stated that he regularly observed Bradford verbally abuse Overall. He also saw Bradford pull her by her hair between 20 and 30 times, hit her on the side or back of the head between 10 and 15 times, push her into a wall between 10 and 15 times, grab her by her arms between 20 and 30 times, and punch her on the back of the head, causing her to lose consciousness when her head hit the wall.

Following closing arguments, the district court instructed the jury on the elements of the three charged offenses and on first-degree heat-of-passion manslaughter as a lesser-included offense of first-degree murder. The jury found Bradford not guilty of premeditated first-degree murder and second-degree murder and guilty of first-degree heat-of-passion manslaughter and first-degree domestic abuse murder. The court then convicted Bradford of first-degree domestic abuse murder and sentenced him to life in prison. Bradford appeals his conviction, asserting numerous errors by the district court. He asks this

court to order a new trial or, in the alternative, vacate his first-degree domestic abuse murder conviction and remand his case for resentencing on the first-degree heat-of-passion manslaughter conviction.

## I.

### Expert Testimony

Bradford argues that the district court committed reversible error by admitting improper expert testimony. More specifically, he asserts that the court improperly allowed the medical examiner to testify that the examiner believed Overall's death to be a homicide. Bradford also argues that the district court erred by admitting hearsay when it allowed the examiner to testify that he had consulted with two other nontestifying experts, who agreed with his opinion.

### A. Expert's opinion regarding manner of death

■ "[T]he admission of an expert's opinion generally rests within the discretion of the trial court" and will not be reversed absent an apparent error. *State v. Myers*, 359 N.W.2d 604, 609 (Minn. 1984). With regard to expert testimony, the Minnesota Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Minn. R. Evid. 702. We have generally permitted expert testimony under this rule if it is helpful. *See State v. Helterbridle*, 301 N.W.2d 545, 547 (Minn. 1980). An expert opinion is helpful if "the members of the jury, having the knowledge and general experience common to every member of the community, would be aided in the consideration of the issues by the offered testimony." *Clark v. Rental Equip. Co., Inc.*, 300 Minn. 420, 428, 220 N.W.2d 507, 512 (1974).

In *State v. Chambers*, we held that a pathologist properly testified to the number and nature of a domestic abuse murder victim's stab wounds, but improperly offered an opinion regarding the defendant's intent. 507 N.W.2d 237, 239 (Minn. 1993). Bradford relies on *Chambers* to argue that the district court improperly allowed the medical examiner to testify that he believed Overall's death was a homicide. Bradford's argument is not persuasive. We stated in *Chambers* that "an opinion otherwise admissible 'is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.'" *Id.* at 238 (quoting Minn. R. Evid. 704).

■ The expert in *Chambers* was permitted to testify regarding the cause of death—stabbing, but was not permitted to offer an opinion regarding intent. *See id.* at 239. Here, the medical examiner properly testified that he believed Overall's manner of death was homicide—the killing of one person by another. The examiner's testimony was helpful to the jury because a lay juror may not be able to differentiate between a self-inflicted intraoral gunshot wound and one inflicted by another. The examiner's specialized knowledge assisted the jury—the trier of fact—to understand the evidence submitted with respect to the circumstances surrounding Overall's death. Therefore, we hold that the district court did not commit error by allowing the examiner to testify regarding his opinion that Overall's death was a homicide.

### B. Statements by nontestifying experts

■ Bradford also argues that the district court erred by admitting hearsay evidence when it allowed the medical examiner to testify that two other nontestifying experts agreed with his opinion that Overall's death was a homicide. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Minn. R. Evid. 801. Such statements are generally inadmissible, but the state argues that the

statements of the nontestifying experts are admissible because Minn. R. Evid. 703(a) permits testifying experts to base their opinion on reliable hearsay. However, the comments to Rule 703(a) state that "[a]lthough an expert may rely on inadmissible facts * * * in forming an opinion, the inadmissible foundation should not be admitted into evidence simply because it forms the basis for an expert opinion."

We conclude that the district court erred by admitting the medical examiner's testimony regarding statements by the two nontestifying experts. Here, the statements were hearsay that did not fall into any applicable exception to the hearsay rule. If the opinions of the nontestifying experts were to be admitted, the experts should have appeared and testified. We hold that the examiner's testimony regarding the opinions of the nontestifying experts was inadmissible hearsay. *See generally* Minn. R. Evid. 802 (stating that hearsay is inadmissible absent an exception).

■ However, not every judicial error warrants reversal. An error is harmless "[i]f the verdict actually rendered was surely unattributable to the error, * * *." *State v. Jones*, 556 N.W.2d 903, 910 (Minn. 1996). Here, the examiner's testimony regarding the opinions of the nontestifying experts was insignificant and cumulative compared to the weight of the other evidence of Bradford's guilt offered at trial. *See, e.g., State v. Bauer*, 598 N.W.2d 352, 367 (Minn.1999) (holding that when evidence was erroneously admitted, such error was harmless when the evidence was insignificant and cumulative). Therefore, we hold that the admission of the hearsay evidence from nontestifying experts was harmless beyond a reasonable doubt because there is no reasonable possibility that the wrongfully admitted evidence could have affected the jury's verdict.

## II.

### Search Warrant

■ Bradford next argues that the district court erred in admitting evidence that was seized under an invalid search warrant.[1] More specifically, Bradford argues that the factual allegations contained in the police affidavit supporting the warrant application were insufficient to support the issuing judge's finding of probable cause and that the search warrant did not authorize seizure of several items taken by police.

■ Both the United States and Minnesota Constitutions protect individuals from unreasonable searches and seizures and provide that warrants must be supported by probable cause. *See* U.S. Const. amend. IV; Minn. Const. art. I, § 10. This court affords great deference to an issuing judge's findings of fact, which we will reverse only if clearly erroneous. *See State v. Lee*, 585 N.W.2d 378, 382–83 (Minn.1998) (citing *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)). But we review de novo the determination of probable cause. *See id.* On review, we determine whether there was a substantial basis to conclude that probable cause existed. *See State v. Zanter*, 535 N.W.2d 624, 633 (Minn.1995).

■ Although the police affidavit in this case was not a model of specificity, an issuing judge need only determine that, based on the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.,* (quoting *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76

---

1. In order to be entitled to protection from an invalid search warrant, a party must first demonstrate that he has standing by showing that he has a legitimate expectation of privacy in the invaded place. *See Rakas v. Illinois*, 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). The record does not unequivocally demonstrate that Bradford had standing at the residence at issue in this search and seizure. However, the state waived this issue; therefore, we will not address standing.

L.Ed.2d 527 (1983)). Here, the affiant stated that the deceased victim suffered a gunshot wound to the head while Bradford was in the home. The affiant also stated that Bradford had admitted "that his keys will have the gun case keys on the ring." These facts present the possibility of a homicide. An issuing judge could find probable cause that evidence of a crime would be found in the home. Therefore, we hold that the search warrant was supported by probable cause.

■■■■■ In addition to being supported by probable cause, a search warrant must particularly describe items to be seized. *See* U.S. Const. amend. IV; Minn. Const. art. I, § 10. This requirement prohibits law enforcement from engaging in general or exploratory searches. *See State v. Mathison*, 263 N.W.2d 61, 63 (Minn.1978). The only items specifically listed on the warrant were firearms, firearms ammunition, blood-like substances, video of the scene, photographs of the scene, firearm cases, and mailings to establish residency. Bradford argues that certain items were improperly seized, including the spent bullet, Overall's clothing, and the keys, because they were not specifically authorized by the warrant. We agree, in part, and conclude that the warrant was invalid to the extent that it did not describe with sufficient particularity all items seized. However, evidence seized without a valid search warrant is nevertheless admissible if it is "in plain view, there was a prior justification for an intrusion, the discovery was inadvertent, and there was probable cause to believe that the items seized were immediately apparent evidence of crime." *State v. Buschkopf*, 373 N.W.2d 756, 768–69 (Minn.1985).

■■■■■ The police officers were justified in entering Overall's home in response to an emergency, and most of the evidence seized was in plain view of the officers who initially walked through the home. However, Bradford, citing *Michigan v. Clifford*, 464 U.S. 287, 296, 104 S.Ct. 641, 78 L.Ed.2d 477 (1984), and *Michigan v. Tyler*, 436 U.S. 499, 506–12, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), argues that the plain view exception does not apply because the officers did not seize anything at the time of the justified initial entry. Instead, they waited to obtain a search warrant and returned later the same evening. They subsequently returned and collected evidence the following morning. Bradford's argument is not persuasive. Both *Clifford* and *Tyler* are distinguishable because the officers in those cases did not re-enter the premises with a valid search warrant. *Clifford*, 464 U.S. at 296–98, 104 S.Ct. 641; *Tyler*, 436 U.S. at 511, 98 S.Ct. 1942. Because the officers in this case were lawfully on the premises pursuant to a search warrant that was supported by probable cause, the officers were authorized to seize evidence that was in plain view and that was immediately apparent evidence of crime.

■■■■ The only evidence that was potentially not in plain view of the police officers who entered the home were the letters and photographs from an upstairs bedroom and hall closet. The district court may have erred by admitting this evidence. Nevertheless, this evidence is peripheral to the elements of the offenses of which Bradford was found guilty. Accordingly, we hold that admission of any evidence that was not in plain view of the officers was harmless error beyond a reasonable doubt.

### III.

#### Fifth Amendment Right to Counsel

■■■■■ Under the Fifth Amendment, an accused must be informed of his right to counsel prior to custodial police interrogation. *See Miranda v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Once an accused asserts his right to counsel, interrogation must cease unless the accused initiates further communication. *See Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). "[W]hen a suspect indicates by an

equivocal or ambiguous statement, which is subject to a construction that the accused is requesting counsel, all further questioning must stop" except for narrow questions to clarify the accused's true desires with respect to his right to counsel. *State v. Robinson,* 427 N.W.2d 217, 223 (Minn.1988). After invoking his right to counsel, an accused may waive that right by reinitiating conversation with the police. *See State v. Howard,* 324 N.W.2d 216, 222 (Minn.1982) (quoting *Edwards,* 451 U.S. at 484–85, 101 S.Ct. 1880). We defer to a district court's factual determination of whether a defendant invoked the right to counsel during an interrogation unless that determination is clearly erroneous. *See State v. Miller,* 573 N.W.2d 661, 671 (Minn.1998).

Before the police interviewed Bradford, and after they explained to him that he had a right to counsel, the following exchange occurred:

> Bradford: So how long will it take you to get somebody down here while I tell you what happened?
>
> Police: Just a minute. Do you understand your rights as I've just given them to you?
>
> Bradford: Yes I do.
>
> Police: Do you want to talk to us?
>
> Bradford: I wanna talk to you but, I wanna have somebody present.
>
> Police: Ok.
>
> Bradford: Because if its ... if its ... you know what I'm sayin' ... if it's a criminal case against me already then ...
>
> Police: Ok.
>
> Bradford: Fuck ... I didn't do shit. I didn't do shit. [the Sgts. get up to leave] So how long is it gonna take before somebody'l ...

The interview transcript and the videotape of the interview demonstrate that at this point the officers stood up and one officer moved toward the door. The interview then continued as follows:

> Q: Ok. You're under arrest for probable cause. Within 36 hours of your arrest ...
>
> A. I'll be either charged ...
>
> Q. ... or released. And your 36 hours starts Monday morning. Today doesn't count and Sundays don't count. So by Tuesday noon you'll know what's up, ok.
>
> A. Ok. Will they ... If I talk to you now, will they send somebody to talk to me.
>
> Q. Will who send somebody?
>
> A. Ummm, you know, the system I guess.
>
> Q. If you're formally charged and you can't afford to represent yourself ...
>
> A. I can't.
>
> ... Then they will appoint someone for you, if you're formally charged.
>
> A. So either way ... so either way it goes I'm gonna sit here until Wednesday?
>
> Q. Tuesday at noon. You will know by Tuesday at noon whether or not you're gonna be charged or released, Cory.
>
> A. Ok, well, I'm gonna tell you what happened.
>
> Q. So, you wanna tell your side of it ...
>
> A. Yeah.
>
> Q .... without an attorney here.
>
> A. Yes.

The district court found that the officers terminated the conversation after Bradford stated, "I wanna talk to you but, I wanna have somebody present," and that Bradford then reinitiated the conversation and waived his right to counsel. The record supports these findings; therefore, we hold that the court properly concluded that Bradford invoked his right to counsel, but then waived that right after reinitiating a conversation with the police.

## IV.

### Confrontation Clause

Bradford next argues that the district court violated his rights under the Confrontation Clauses of the United States and Minnesota Constitutions. *See* U.S. Const. amend. VI; Minn. Const. art. I, § 6. Specifically, Bradford argues that Overall's verified petition and affidavit for order for protection and the shelter coordinator's testimony regarding Overall's statements during an intake interview were inadmissible hearsay and deprived him of this right to confront the witnesses against him. In response to this argument, the state asserts that admission of the challenged affidavit and testimony does not violate hearsay rules because they are sufficiently trustworthy.

In *Idaho v. Wright*, the Supreme Court held that out-of-court statements that are barred by the hearsay rule and the Confrontation Clause may be admissible if the declarant is unavailable and the statement bears adequate "indicia of reliability." 497 U.S. 805, 814–15, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). Such indicia are present if the hearsay statement falls within a firmly rooted hearsay exception or is supported by particularized guarantees of trustworthiness. *See id.* at 815, 110 S.Ct. 3139. Particularized guarantees of trustworthiness exist "if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility * * *." *Id.* at 820, 110 S.Ct. 3139. A court determines whether these guarantees exist by examining the totality of the circumstances that surround the making of the statement without relying on whether other evidence at trial corroborates the statement. *See id.* at 819, 110 S.Ct. 3139.

Bradford argues that Overall's statements in the verified affidavit for order for protection were inadmissible because they are not trustworthy. We recently addressed an issue similar to the one Bradford raises here. *See State v. Grube*, 531 N.W.2d 484 (Minn.1995). More specifically, in *Grube* we considered whether two protection order affidavits made by the victim and hearing transcripts were admissible in a domestic abuse murder case. *See id.* at 489–90. In addressing this issue, we recognized three relevant factors to consider in determining the trustworthiness of hearsay statements: "(1) whether the context of the statements and the persons to whom they were made suggest that they were reliable; (2) whether the declarant had a motive for lying or problems with memory; and (3) whether the declarant had personal knowledge of the identity and role of the participants in the crime." *Id.* at 489.

Applying this test to the facts before us in *Grube*, we noted that the victim made the statements under oath, believed that she would be cross-examined later, and then testified under oath. *See id.* at 490 & n. 8. We further noted that the record did not suggest that the victim incompletely or inaccurately recalled any of the facts contained in her affidavits and that there was no suggestion that she suffered any mental disability at the time she made the affidavits. *See id.* She also made the affidavits and testified shortly after the recounted events had occurred. *See id.* Therefore, we concluded in *Grube* that there were sufficient guarantees of trustworthiness and held that the district court did not err by admitting the victim's statements. *See id.*

The district court in this case relied on *Grube* to admit Overall's statements in the verified affidavit, specifically noting that Overall signed the affidavit under oath. However, this case is distinguishable from *Grube*. The victim in *Grube* appeared and testified as to the contents of her affidavits. Here, Overall did not appear for the hearing at which she would be subject to cross-examination and possible questioning from the judge. Nor does the record provide us with any basis to sufficiently analyze the other factors that we listed as relevant in *Grube*.

Without a record that enables us to evaluate the trustworthiness of the statements based on the totality of the circumstances surrounding the making of the statements, we are unable to determine whether such particularized guarantees of trustworthiness are present so as to render cross-examination a test of marginal utility. However, we do not need to substantively address this issue. Given the substantial amount of other admissible evidence at trial that demonstrated a pattern of domestic abuse, if the court erred by admitting the affidavit, we hold that such error is harmless beyond a reasonable doubt.

 Bradford also argues that Overall's oral statements to the shelter coordinator were inadmissible and violated his rights under the Confrontation Clause. The coordinator testified that, during an intake interview, Overall stated that Bradford had threatened to kill her and had destroyed everything in her apartment the night before. The district court found that these statements were sufficiently reliable, and therefore admissible, because they were supported by the verified petition and affidavit for order for protection. But, as we noted earlier, under *Wright*, the evaluation of whether a hearsay statement is sufficiently reliable cannot include consideration of whether other parts of the record corroborate the statement. 497 U.S. at 819, 110 S.Ct. 3139; *see also State v. Lanam*, 459 N.W.2d 656, 661 (Minn. 1990) ("the focus is not on all the circumstances, including evidence at trial corroborating the * * * statements, but only on those circumstances actually surrounding the making of the statements."). Therefore, in considering the admissibility of Overall's statements to the coordinator, we conclude that the district court erred by using the affidavit to corroborate these oral statements.

 The district court also found that the contested statements to the shelter coordinator fell within a firmly-rooted hearsay exception because they indicated Overall's present fear and state of mind.

As an exception to the general rule that hearsay is inadmissible, Minn. R. Evid. 803(3) provides that the following hearsay statements are admissible: "A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed * * *." *See also* Minn. R. Evid. 802. Overall's statements to the coordinator do not fit within this hearsay exception because they went beyond describing her existing state of mind. Instead, she described specific conduct allegedly committed by Bradford and her statements were admitted for the truth of the matter asserted. As such, her statements do not fall within this hearsay exception. Therefore, we conclude that the district court erred in admitting the coordinator's testimony relating her conversation with Overall. However, because we acknowledge that there was a substantial amount of admissible evidence demonstrating a past pattern of domestic abuse, we hold that this error was also harmless beyond a reasonable doubt.

## V.

### Prosecutorial Misconduct

 A prosecutor may not seek a conviction at any price. *See State v. Salitros*, 499 N.W.2d 815, 817 (Minn.1993). "Rather, the prosecutor is a 'minister of justice' whose obligation is 'to guard the rights of the accused as well as to enforce the rights of the public.'" *Id.* (citation omitted). However, prosecutorial misconduct during a trial does not require reversal and a new trial if the misconduct is harmless beyond a reasonable doubt. *See State v. Ashby*, 567 N.W.2d 21, 27–28 (Minn.1997).

 Bradford asserts that there were five incidents of prosecutorial misconduct during closing arguments. First, the prosecutor showed the jury Overall's high

school graduation photograph and contrasted the photograph with her autopsy photograph and spoke about how Overall's death would affect her children. Bradford argues that these actions were intended to improperly inflame the jury's passions. We have held that the state may discuss the victim's life if it does not attempt to influence the jury's prejudice or passion. *See State v. Hodgson,* 512 N.W.2d 95, 97 (Minn.1994). Further, in *State v. Buggs,* we held that showing the jury the victim's picture before and after death and portraying her as a mother was not prosecutorial misconduct. 581 N.W.2d 329, 342 (Minn.1998). Accordingly, we conclude that similar conduct in this case was not improper.

■ Second, the prosecutor also discussed the generally tragic nature of domestic abuse and urged the jury not to "look away" from the facts, but to "render a true and just verdict" by finding Bradford guilty. In *State v. Porter,* we held that the prosecutor may not appeal to the jury's passion and then urge them to reach the right verdict. 526 N.W.2d 359, 365 (Minn.1995). However, there is a distinction between requesting the jury to reach the "right" verdict and asking the jury to find the defendant guilty. *See id.* We therefore conclude that this part of the prosecutor's closing argument did not constitute misconduct.

■ Third, Bradford argues that the prosecutor improperly offered her personal opinion when she stated: "I submit to you [Overall] was killed by her partner * * *." A prosecutor may not offer a personal opinion as to the defendant's guilt. *See State v. Van Alstine,* 305 Minn. 276, 287, 232 N.W.2d 899, 906 (1975). However, in this case the state was offering an interpretation of the evidence rather than a personal opinion as to guilt. Therefore, we conclude that this statement does not constitute prosecutorial misconduct.

■ Fourth, Bradford contests the following comments, arguing that the prosecutor speculated on events without factual basis in the record.

What happened in that apartment that day, that late, hot Saturday afternoon?

* * * *

There is [sic] phone calls, phone calls? Let's [sic] everybody in the world know what a slut you are. I am not satisfied with that, though, and things escalate and this time they escalate beyond fists and escalate beyond heat. And a gun is obtained. The assault continues. Imagine the rage and imagine the terror. What better place to terrorize than that basement, a place that she didn't like to go, a place that had been painted shut. And there she is, at the top of the stairs, facing him, looking death in the face. * * * Once again she is hoping to survive another attack. Does she beg, does she plead with him? Does she try to push the gun away? Does she hope if she is quiet, if she submits that that wouldn't happen, does she? Where are the children? Are they there? Are they seeing what's going on? Where are they? They're on the floor of the house somewhere. Are they watching? Is the defendant saying, suck on this, bitch? Does she say the wrong thing or does he look in her eyes and pull the trigger?

■ Arguments of counsel must not speculate about events occurring at the time of the killing absent a factual basis in the record. *See State v. Thompson,* 578 N.W.2d 734, 742 (Minn.1998). Further, "arguments that invite the jurors to put themselves in the shoes of the victim are considered improper." *State v. Johnson,* 324 N.W.2d 199, 202 (Minn.1982). Here, the prosecutor committed misconduct by engaging in speculation about the events surrounding Overall's death, even to the point of creating dialogue.

Finally, after questioning why someone would commit domestic abuse, the prosecutor stated: "The State is not required to explain this, I suggest to you, twisted thought process." In *Buggs,* we concluded that the prosecutor's references to the defendant as a "coward" with a "twisted thought process" were improper, but we held that the misconduct was harmless. 581 N.W.2d at 342. Here, we conclude that similar comments were improper for the same reasons as in *Buggs* —it was an improper character attack made by the prosecutor against the defendant during closing argument.

Having concluded that the prosecutor in this case improperly speculated about events occurring at the time of the killing and made an improper character attack during closing argument, we next address whether this misconduct constitutes harmless error or requires a new trial. We have stated that if a verdict is "surely unattributable to the error, the error is harmless beyond a reasonable doubt." *Ashby,* 567 N.W.2d at 28. In light of the substantial evidence of Bradford's guilt compared with the isolated nature of this conduct, we hold that this prosecutorial misconduct was harmless beyond a reasonable doubt.

## VI.

### Inconsistent Verdicts

The jury returned verdicts finding Bradford guilty of both first-degree heat-of-passion manslaughter and first-degree domestic abuse murder. A defendant is guilty of first-degree heat-of-passion manslaughter if he "intentionally causes the death of another person in the heat of passion provoked by such words or acts of another as would provoke a person of ordinary self-control under like circumstances * * *." Minn.Stat. § 609.20(1) (1998). He is guilty of first-degree domestic abuse murder if he "causes the death of a human being while committing domestic abuse when [he] has engaged in a past pattern of domestic abuse upon the victim and the death occurs under circumstances manifesting an extreme indifference to human life." Minn.Stat. § 609.185(6).

Bradford argues that these two verdicts are inconsistent because first-degree heat-of-passion manslaughter requires intent whereas first-degree domestic abuse murder requires extreme indifference. We disagree. While domestic abuse murder only requires extreme indifference, it does not preclude the possibility that a higher level of intent may be present. *See, e.g., State v. Cole,* 542 N.W.2d 43, 51 (Minn.1996) (holding that first- and second-degree intentional murder verdicts are consistent with a felony murder verdict because *lack of intent* is not an element of second-degree felony murder). We conclude that lack of intent is not an element of first-degree domestic abuse murder as the legislature has defined the offense. We therefore hold that the jury verdicts in this case are consistent.

## VII.

### Sentencing

Bradford next argues that the district court erred by sentencing him for first-degree domestic abuse murder when the sentence should have been reduced because of the first-degree manslaughter verdict. In order to address this argument, we must interpret the first-degree domestic abuse murder statute. The goal of statutory interpretation is to effectuate the intent of the legislature. *See* Minn. Stat. § 645.16 (1998). In ascertaining legislative intent, courts should presume that the legislature does not intend a result that is absurd, impossible, or unreasonable. *See* Minn.Stat. § 645.17(1) (1998).

First-degree premeditated murder may be mitigated to the lesser-included offense of first-degree manslaughter if the defendant acted in the heat of passion. *See State v. Auchampach,* 540 N.W.2d 808, 817 (Minn.1995) (citing Minn.Stat. § 609.20(1)). The heat-

of-passion manslaughter statute "evince[s] a legislative intent to excuse or mitigate a homicide where a defendant behaves as would a reasonable person." *State v. Buchanan*, 431 N.W.2d 542, 549 (Minn.1988). In contrast, the domestic abuse murder statute evinces a legislative intent to increase the penalty for a homicide that in some circumstances might be considered heat-of-passion manslaughter when the homicide occurs as part of a pattern of domestic abuse. By enacting the domestic abuse murder statute, the legislature has provided that, in the context of domestic abuse, heat of passion is not a mitigating circumstance because domestic abuse frequently occurs in the heat of passion. As noted above, we must not construe legislation in a way that will achieve an absurd result. If we construed the domestic abuse murder statute so that heat of passion mitigated the offense, the statute would be stripped of its purpose. Therefore, we hold that heat-of-passion manslaughter is not a lesser-included mitigating offense of first-degree domestic abuse murder.

## VIII.

### Pro Se Arguments

Bradford raises two pro se issues regarding judicial bias in assignment of judges and jury tampering. We have considered both of these arguments and find them lacking in merit.

Affirmed.

STRINGER, Justice (concurring in part, dissenting in part).

I agree with the court's ruling with respect to appellant's various claims of error and its conclusion that the prosecution engaged in misconduct in closing argument. However, I disagree with the court's conclusion to dismiss the misconduct with the facile conclusion that it was harmless error. I therefore respectfully dissent as to the court's ruling in this respect.

Justice is not only an end result; it is also the process that leads to the result, and even though the result may be justified, we cannot say that justice is served when the process is flawed. That is what happened here. It is true, as the court concludes, that the evidence of appellant's guilt of this heinous crime was substantial, and I do not challenge the court's conclusion that the verdict was surely unattributable to the error injected by the prosecutor's misconduct. What I do challenge is the court's disposition of this issue.

A short time ago, in *State v. Buggs*, 581 N.W.2d 329 (Minn.1998), we reviewed a criminal conviction for the first-degree murder of a victim who had long been the subject of abuse by the appellant, not unlike the situation here. *Id.* at 332–33. In *Buggs* we engaged in an extensive review of numerous allegations of prosecutorial misconduct, among them, the prosecutor's reference to appellant as a "coward" with a "twisted" thought process. *Id.* at 340–43. We concluded that the "references were prosecutorial misconduct but harmless under the circumstances." *See id.* at 342. We also reviewed two other charges of misconduct that we considered "of far more serious nature." *Id.* The first related to one prosecutor whispering to another, in a manner that could be heard by the jury, that a witness was lying. *See id.* We observed that extensive voir dire by the court and trial counsel to determine whether the jury was influenced by the remark may well have prevented a mistrial. *See id.* at 343. The second act of serious misconduct was called to the attention of the trial court by jurors who were alienated by the prosecutor's offensive use of body language to display disgust with various aspects of the trial, including the court's rulings. *See id.* Because of the jury's adverse reaction to what we characterized as "amateur displays," we concluded that the conduct did not prejudice the defendant, but we expressed concern that the prosecutor's conduct demeaned the participants in the trial and the court. *Id.* Indeed, we were so concerned that we took

the unusual step of calling the matter to the attention of the Lawyers Professional Responsibility Board because of the potential that the prosecutor's misconduct would distract "the jury from its proper role, undermin[e] the integrity of the legal profession and offend[ ] the dignity of the court * * *." *Id.*

Less than a year passed from the filing of our opinion in *Buggs* to the commencement of trial in this case and the same prosecutor again represented the state. With this court's admonition about her misconduct in *Buggs* so freshly in mind, it is difficult to comprehend why she would engage in precisely the same misconduct we identified in *Buggs* even to the point of again referring to the defendant as "twisted." But with even greater recklessness and disregard for the time honored principle that prosecutorial advocacy must be limited to facts in evidence and not speculation, *see, e.g., State v. Salitros,* 499 N.W.2d 815, 817 (Minn.1993) (requiring that in closing argument a prosecutor refrain from misstating evidence, misleading the jury as to inferences that may be drawn from the evidence, and using argument calculated to inflame the passions of the jury), in her closing argument she engaged in a rampant dissertation of fantasy as to what might have been the events leading up to the shooting, escalating tension referring to rage and terror, where the children might have been in the victim's final moments, whether the victim pleaded with defendant, and more—all with the obvious and deliberate intention of appealing to the passion of the jury, and all unquestionably serious and prejudicial misconduct.

The prosecutorial misconduct here clearly represents a flagrant disregard for the judicial process and the prosecutor's obligation as an officer of the court to refrain from conduct that would deny a defendant a fair trial. *See id.* (noting that a prosecutor is obligated to "guard the rights of the accused as well as to enforce the rights of the public"). It is no less flagrant than her misconduct in *Buggs,* but here we have the added factor of this court's admonition to her just a few months before the trial of this case. In my view, at the very least, the court should again refer the matter of her misconduct to the attention of the Lawyers Professional Responsibility Board in light of the repetition of her previous misconduct and ignoring her responsibilities as an officer of the court. But I would go further. I believe the prosecutor's misconduct in her closing argument so seriously flawed the judicial process that sufficient doubt is raised as to whether appellant received a fair trial. *See State v. Ashby,* 567 N.W.2d 21, 27–28 (Minn.1997) (stating that a defendant is entitled to a new trial for prosecutorial misconduct unless it is harmless beyond a reasonable doubt); *State v. Jones,* 277 Minn. 174, 189, 152 N.W.2d 67, 78 (1967) (granting a defendant a new trial based on several instances of prosecutorial misconduct, including an improper closing argument). Therefore, I would reverse and remand for a new trial in the interest of justice.

PAGE, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Stringer.

GILBERT, Justice (concurring in part, dissenting in part).

I join in the concurrence and dissent of Justice Stringer.