#24048-a-SLZ

**2007 SD 112**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                          Plaintiff and Appellee,

    v.

KELLY DEAN BOYER,                               Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
DAVISON COUNTY, SOUTH DAKOTA

* * * *

HONORABLE RONALD K. MILLER
Judge

* * * *

LAWRENCE E. LONG
Attorney General

KATIE L. HANSEN
Assistant Attorney General                      Attorneys for plaintiff
Pierre, South Dakota                            and appellee.

MIKE C. FINK of
Bjorkman & Fink
Bridgewater, South Dakota

DOUGLAS N. PAPENDICK of
Stiles Law Firm                                 Attorneys for defendant
Mitchell, South Dakota                          and appellant.

* * * *

CONSIDERED ON BRIEFS
ON MARCH 19, 2007

OPINION FILED **10/31/07**

#24048

ZINTER, Justice

[¶1.]      Kelly Boyer appeals his conviction of murder in the second degree in the death of nineteen-month-old B.P.  We affirm.

[¶2.]      Boyer and his girlfriend Jessica Jones lived together in Mt. Vernon, South Dakota.  Two children resided in the home: their four-month-old daughter and nineteen-month-old B.P., Jones' son from a previous relationship.

[¶3.]      On October 29, 2004, Boyer's seventeen-year-old cousin, M.S., spent the night at the home.  The next morning, Jones left for work in Mitchell, South Dakota.  Boyer stayed at home with M.S. and the two children.  Later that day, Boyer and M.S. drove to Jones' place of employment informing her that B.P. needed to go to the hospital because he had fallen down the stairs.  They picked up Jones and drove B.P. to the hospital in Mitchell.  B.P. was subsequently airlifted to Sioux Falls where he died three days later.

[¶4.]      At trial, M.S. told a different story about B.P.'s injury.  M.S. testified that Boyer invented the story about B.P. falling down the stairs, and the actual chain of events was as follows:  B.P. had been crying on and off all day, wanting his mother.  Boyer consequently wrapped B.P. in a blanket and put him in a "crunch position."  Boyer then began to move back and forth, shaking B.P. three or four times.  After the shaking, Boyer threw B.P. on the floor and B.P. began to convulse.  After the convulsions, B.P. stopped breathing and M.S. began to administer CPR.  Although B.P. began to breathe, his breaths were short and choppy.  M.S. then suggested they take B.P. to the hospital.

-1-

[¶5.] Boyer alleged that M.S., a prior juvenile offender, changed his story after the State's lead investigator threatened that either M.S. or Boyer was going to get arrested. M.S. was in custody when he changed his story. M.S.'s juvenile records became the subject of a pretrial discovery request. After an in camera review, the trial court denied Boyer's motion for discovery. Cross-examination was prohibited regarding M.S.'s juvenile record.

[¶6.] Boyer also had a criminal record. The trial court entered a pretrial order prohibiting testimony or reference to his prior criminal convictions. During the first morning of voir dire, however, it was revealed by the jury selection questionnaire that several prospective jurors had read an article published that day in the local newspaper referring to Boyer's record.[1] During an afternoon break, Boyer reminded the trial court of the morning's discussions on the issue and he requested individual, sequestered voir dire. Counsel argued:

> There were a lot [of jurors] who read this morning's paper that contained that, and I'm not sure what was contained in previous articles. I'm not sure if they had a discussion about drugs. And when these people indicated they had read that article, of course, we went back in or we went up here to the bench and discussed the matter just informally, and I didn't have an opportunity to explain what the article said. What I wanted to do was explore with each of those individually out of the hearing of the presence of the jury so we could explore what they read

---

1. The article reported:

> Boyer was arrested on a felony drug charge and other misdemeanor offenses that occurred at the Mount Vernon residence where [B.P.] was injured. Those drug charges were dismissed and Boyer – who was on probation at the time of the incident for a felony theft that occurred in 2001 – was taken to the state penitentiary in early December to serve out his three-year prison sentence.

and how they felt about that. I can't do that in front of all the other jurors.

[¶7.] Boyer's counsel also asked if he could excuse a juror if the juror had read the article. The trial court indicated it would not grant a challenge for cause simply because a juror indicated that he or she had read the article. The court did, however, rule that Boyer could ask individual jurors if they read the article and could set it aside and not consider it in making a decision. Although the court indicated that this could be handled without sequestering the jurors, it also ruled:

> What I just said in ruling does not mean that if there is something that comes up from individual questioning of some juror, prospective juror that would lead to some other reason other than the fact there was an article in the paper. I mean, we could go back into chambers but not just on the fact there was an article. But on questioning, if something does come up, we could explore it further in chambers.

After the break, Boyer asked the jurors whether they had knowledge of the newspaper article, and if so, whether they could put what they read aside. All indicated they could do so.

[¶8.] During the second day of trial, Boyer requested to re-voir dire some of the jurors who had already been passed for cause. Counsel argued:

> [D]uring voir dire several of the potential jurors had indicated that they had read yesterday's . . . article[.] I'm assuming that the jurors who had read this article read the entire article, and they have subsequently heard things that should be inadmissible and that they should not have heard. We did request that we voir dire each of the jurors who had read the article, and we would like to do that individually. I cannot for practical purposes voir dire them in front of the entire jury panel about drug offenses and how they feel about that because then it would inflame the entire panel. . . . At this point, most of [them] indicated – in fact I believe *all of them have indicated that it will not affect their decision in the case*, but that forces us to either

> leave them on the panel with that knowledge about the drug offense and the penitentiary time or use our peremptory.

The trial court denied Boyer's request for a second voir dire.

[¶9.] The State utilized two expert witnesses regarding the death of B.P. The first witness, Dr. Brad Randall, the Minnehaha County Coroner, performed an autopsy on B.P. He opined that the chance of B.P.'s injuries being caused by a fall down a flight of stairs was extremely small. The State's second expert, Dr. Lisa Sieczkowski, opined that B.P.'s injuries were inconsistent with a fall and were consistent with being shaken or thrown. Following a pretrial *Daubert* hearing, the trial court found that the opinions offered by the experts were reliable and of assistance to the jury.

[¶10.] Boyer appeals his conviction raising the following issues:

1. Whether the trial court erred in refusing to allow discovery and cross-examination on M.S.'s juvenile record.

2. Whether the trial court erred in refusing individual voir dire and challenges for cause regarding the newspaper article.

3. Whether the trial court erred in admitting Dr. Randall's "manner of death" testimony and all of Dr. Sieczkowski's testimony.

*1. Juvenile Records*

[¶11.] Boyer claims that his Sixth Amendment right to confrontation was violated by the trial court's refusal to allow discovery and cross-examination on M.S.'s juvenile record. *See* State v. Wounded Head, 305 NW2d 677, 681 (SD 1981). We generally review these confrontation issues de novo. State v. Carothers, 2005 SD 16, ¶7, 692 NW2d 544, 546.

[¶12.]    Boyer argues that the trial court erred in denying his request to use M.S.'s juvenile records for impeachment purposes.  SDCL 19-14-15 (Rule 609(d)) controls the admission of juvenile records for impeachment.  It permits admission in certain cases if the records would have been admissible to attack the credibility of an adult:

> Evidence of juvenile adjudications is generally not admissible under § 19-14-12.[2]  The court may, however, in a criminal case allow evidence of a juvenile adjudication of a witness other than the accused if conviction of the offense would be admissible to attack the credibility of an adult and the court is satisfied that admission in evidence is necessary for a fair determination of the issue of guilt or innocence.

SDCL 19-14-15.

[¶13.]    In this case, the trial court found that there was no admissible evidence in the records that affected M.S.'s credibility.  The trial court explained:

> Attorney:  [M.S.] apparently has a juvenile record.  We had made a motion for discovery.  The [c]ourt was going to make an in camera inspection of his juvenile record and any counseling records if there were any and determine whether or not we could cross examine for

---

2.    This statute provides:

> For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted but only if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party or the accused and the crime:
>
> (1) Was punishable by death or imprisonment in excess of one year under the law under which he was convicted; or
> (2) Involved dishonesty or false statement, regardless of the punishment.

SDCL 19-14-12.

> impeachment purposes, cross examine [M.S.] on some things that may be contained in that.
>
> Court: His record is underage consumption and an escape.
>
> Attorney: But his juvenile record may contain some items that could be used to impeach his credibility.
>
> Court: There isn't any.
>
> Attorney: He was in Chamberlain Academy.
>
> Court: That's for the escape.
>
> Attorney: Okay. That would be a felony if he were an adult, and we would like to be able to cross examine him –
>
> Court: No.
>
> Attorney: --to impeach his credibility.
>
> Court: No, not on that. He was supposed to show up for, I think, disposition or something. He didn't show up. They called it escape. It doesn't go to credibility.
>
> Attorney: Our objection is noted.
>
> Court: There wasn't any counseling report or record or anything like that. He was for a time under the auspices of – I can't think of the name of it. It's a state program for people that would be [in] adjustment training centers. They found out he wasn't eligible for that. As far as counseling or anything like that, there is no record of it.
>
> Attorney: Well, primarily what we're concerned about with regards to the counseling records are just basically what the counseling records were after this incident, if he talked to a counselor about it, and that's what we would be most concerned about.
>
> Court: That isn't in anything I got. I just got his juvenile record from a probation officer.
>
> Attorney: Okay. All right.

[¶14.]     The trial court's analysis was correct. M.S.'s juvenile record involved charges of underage consumption and escape. The underage consumption offense was not admissible because it would not have been admissible to attack the credibility of an adult. *See* SDCL 19-14-12. The "escape" arose from a mere failure to appear at a juvenile disposition as opposed to a traditional escape. Under these circumstances, we see no error in the trial court concluding that this conduct did not go to M.S.'s credibility.

#24048

[¶15.]    This Court has recognized that this type of cross-examination on juvenile records not relating to possible biases, prejudices, or motivations to be untruthful in the case at hand does not implicate Sixth Amendment concerns:

> The Supreme Court in *Davis* distinguished between a general attack on credibility, which it characterized as an effort "to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony[,]" and a more particular attack on the witness' credibility, "effected by means of cross-examination directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand."

State v. Sprik, 520 NW2d 595, 600 (SD 1994) (citing State v. Rough Surface, 440 NW2d 746, 752 (SD 1989) (citing Davis v. Alaska, 415 US 308, 316, 94 SCt 1105, 1110, 39 LEd2d 347, 353-54 (1974))).  In *Sprik,* after an in camera review of a rape victim's juvenile records, the trial court refused to allow cross examination on those records because:  they did not relate to questions of bias or prejudice arising in the case in which the testimony was to be given; and the victim was subject to cross-examination on those other issues.  *Id.*  This Court affirmed, concluding that Sprik "failed to show that a reasonable jury probably would have had significantly different impression of [the juvenile's] credibility if he had been allowed to use her juvenile records for impeachment purposes."  *Id.* at 600.

[¶16.]    Although Boyer argues *Sprik* is distinguishable because the witness in that case was not threatened with criminal prosecution, that argument is misplaced.  Even if the threat of arrest affected M.S.'s motive to testify truthfully, the trial court did not limit M.S.'s cross-examination on that matter.  Therefore, like Sprik, Boyer failed to show error.  He also failed to show prejudice; i.e., that a

-7-

reasonable jury would have had a significantly different impression of M.S.'s credibility had Boyer been allowed to cross-examine M.S. on his juvenile record. *Id.* at 600.[3]

## 2. *Individual Voir Dire and Challenges for Cause*

[¶17.] Boyer claims that the trial court erred in refusing individual, sequestered voir dire, and that he should have been allowed to challenge any juror who had read the newspaper article. We review the decision to allow individual voir dire under the abuse of discretion standard of review.

> SDCL 23A-20-6 provides that "the court *may in its discretion* allow examination of one or more jurors apart from the other jurors." There is, however, no "right" or "requirement" that prospective jurors be individually examined out of the presence of other jurors. Individual voir dire is only a "precautionary procedure which may be permitted, in the discretion of the trial court . . . ."

State v. Owens, 2002 SD 42, ¶18, 643 NW2d 735, 744 (internal citations omitted).

[¶18.] In reviewing the question of individual voir dire, we first note that Boyer was allowed to inquire whether jurors could set the article aside and be impartial. We also note that individual voir dire of specific jurors was permitted if an issue arose. The trial court only prohibited individual, sequestered voir dire merely because a juror admitted to reading the newspaper article. We finally observe that Boyer admits that all of the jurors who read the article indicated that

---

3. Boyer also relies on *State v. Volk*, 331 NW2d 67 (SD 1983). He argues that under *Volk*, juvenile records must always be available for cross-examination when the information is admissible and discoverable. However, Boyer's argument is expressly premised on the records first being admissible. In this case, M.S.'s juvenile records were not admissible. Therefore,*Volk* is inapposite.

they could still act fairly and impartially. Under these circumstances, we see no abuse of discretion in the trial court's rulings.

[¶19.] Regarding the question of challenges for cause, SDCL 23A-20-13.1(11) allows a challenge for cause "only if a prospective juror with knowledge of some or all of the material facts of the case also has 'an *unqualified* opinion or belief as to the merits of the case.'" *Owens*, 2002 SD 42 at ¶19, 643 NW2d at 744. In this case, Boyer has failed to identify any juror that may have had an unqualified opinion as to the merits of his case. As previously mentioned, all of the jurors that read the article indicated that they could be impartial and would not consider the newspaper article in their deliberations. Boyer's challenge for cause argument is without merit.

### 3. Expert Testimony

[¶20.] Boyer argues that Dr. Randall's testimony regarding the manner of B.P.'s death was improperly admitted because he could not say to a reasonable degree of forensic certainty that B.P.'s injuries were the result of a throwing or shaking. Regarding Dr. Sieczkowski, Boyer argues that she lacked the qualifications necessary to testify and her testimony was not based on any forensic findings. Boyer finally argues that neither Dr. Randall's nor Dr. Sieczkowski's opinion assisted the trier of fact.

[¶21.] Admission of expert testimony is governed by SDCL 19-15-2 (Rule 702)[4]. The two preliminary determinations for a trial court concerning the

4. SDCL 19-15-2 provides:

(continued . . .)

admission of expert testimony are relevance and whether the testimony will assist the trier of fact. State v. Guthrie, 2001 SD 61, ¶32, 627 NW2d 401, 415. The proponent of the testimony must show that it meets these requirements. *See id.* at ¶34, 627 NW2d at 415-16. We review the trial court's decision under the abuse of discretion standard. *Id.* at ¶30, 627 NW2d at 414-15 (internal citations omitted).

*Dr. Randall*

[¶22.] The issue for the jury was whether B.P.'s injuries were either accidental from falling down the stairs or the subject of homicide from being thrown to the floor. Dr. Randall is a licensed and board certified forensic pathologist who performed B.P.'s autopsy. Regarding B.P.'s manner of death, he opined that the likelihood B.P.'s injuries occurred as a result of falling down a flight of stairs was extremely small. Dr. Randall's opinion was certainly relevant and of assistance in determining whether B.P.'s injuries were accidental or intentional.

[¶23.] His opinion was also reliable. The trial court found that Dr. Randall's methodology was "the same methodology employed by doctors on a daily basis," and concluded that it was "reliable, subject to peer review, and widely accept[ed]." With respect to sufficient forensic/medical certainty, Dr. Randall testified that his opinion was based on his experience as a forensic pathologist, i.e., that statistically speaking, the likelihood of these injuries resulting from a fall down the stairs was

---

(. . . continued)

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

extremely unlikely. He also indicated that his opinion was based on a reasonable degree of medical certainty.

> Q: *Doctor, did you also form an opinion to a reasonable degree of medical certainty as to the manner of [B.P.'s] death?*
> *A. Yes, I did.*
> Q. And how did you classify that?
> A. I classified the manner of death as homicide. . . .
> Q. And why did you conclude that?
> A. The conclusion was based on my interview with the law enforcement officers that were investigating the death and in conjunction with the autopsy findings that suggested that natural disease certainly was not an option in this case nor was suicide an option in this case and that the circumstances surrounding the death were by far more consistent with homicide versus accident.

(Emphasis added.) Although Dr. Randall considered extrinsic information in reaching his opinion, he further explained that receiving extrinsic evidence was widely accepted in the medical field:

> Q. And it's common for doctors to ask people who saw an injury take place what happened there. I mean, they need to find out from witnesses or if the individual person is able to speak; correct? . . .
> A. Yes, it's an integral part. It's called history taking. It's an extremely important part of what any physician does on the care of a patient.
> Q. And you certainly did that before describing a manner of death opinion, did you not?
> A. Yes, I did.

[¶24.] Based on all of his testimony, we conclude that Dr. Randall's testimony was based upon a reasonable degree of forensic certainty because it was based upon a reasonable degree of medical certainty and it was accepted in his practice of forensic pathology.

*Dr. Sieczkowski*

[¶25.]     Dr. Sieczkowski's testimony was limited to whether a fall down a flight of stairs and whether being shaken or thrown were consistent with B.P.'s injuries. She concluded that B.P.'s "injuries [were] not consistent with a fall down stairs; [t]hat [B.P.]'s injuries were not accidental; [and] [t]hat [B.P.]'s injuries [were] consistent with either being shaken or thrown." Boyer argues that Dr. Sieczkowski should not have been allowed to testify because: she was not qualified; and her opinions were not based upon any forensic findings or science. He contends her opinions were subjective and were not expressed to a reasonable degree of forensic certainty.

[¶26.]     In its findings, the trial court found: "(1) Dr. Lisa Sieczkowski received her M.D. from the University of Nebraska, School of Medicine in 2000; (2) She is a licensed and Board Certified Pediatrician; [and] (3) She is a member of the Suspected Child Abuse and Neglect (SCAN) Team." The trial court did not abuse its discretion in concluding that Dr. Sieczkowski was qualified to testify.

[¶27.]     Boyer, however, also argues that Dr. Sieczkowski's opinions were subjective and were not based upon any forensic findings, science, or reasonable forensic certainty. This argument also fails. First, the trial court specifically found, "[t]he methodology employed by Dr. Sieczkowski in arriving at her conclusions and opinions is the same methodology employed by doctors on a daily basis." Second, her opinions were supported by statistics, and Boyer did not show any contrary evidence suggesting that this type of evidence was unreliable. Third, Dr. Sieczkowski based her opinion on her experience, her review of the literature, and her review of the evidence (which included reviewing B.P.'s medical records). The

trial court finally found that her methodology was reliable, subject to peer review, and widely accepted. This record does not suggest her opinions were subjective and not based upon a reasonable degree of medical/forensic certainty.

[¶28.] The record further suggests that like Dr. Randall, Dr. Sieczkowski's opinions were of assistance to the jury. As previously noted, the medical experts informed the jury of the types of injuries that were consistent with being thrown and the types of injuries that were consistent with falling down stairs. Like Dr. Randall, Dr. Sieczkowski's opinions were of assistance in determining this fact necessary to reach a verdict on homicide.

[¶29.] We finally note that neither expert usurped the function of the jury by testifying that B.P. actually died as a result of being shaken or thrown down. Nor did the experts opine whether they thought Boyer was guilty. Although "[o]pinions merely telling a jury what result to reach are impermissible as intrusive, notwithstanding the repeal of the ultimate issue rule," *Guthrie*, 2001 SD 61 at ¶33, 627 NW2d at 415 (citations omitted), neither doctor so opined in this case. For all of the foregoing reasons, Boyer failed to show that the trial court abused its discretion in admitting the experts' opinions.

[¶30.] Affirmed.

[¶31.] GILBERTSON, Chief Justice, and SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.