STATE of Minnesota, Respondent,

v.

DAO XIONG, Appellant.

No. A11–2022.

Supreme Court of Minnesota.

April 24, 2013.

found that the complaints in the proceeding, even if "deserving of greater scrutiny," were "credible."

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, Saint Paul, MN; and Peter Orput, Washington County Attorney, Stillwater, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Davi E. Axelson, Assis-

tant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

WRIGHT, Justice.

Appellant Dao Xiong was found guilty by a jury of first-degree premeditated murder, Minn.Stat. § 609.185(a)(1) (2012), second-degree intentional murder, Minn. Stat. § 609.19, subd. 1(1) (2012), and second-degree unintentional murder while committing a felony, Minn.Stat. § 609.19, subd. 2(1) (2012), arising out of the death of Youa Ty Lor. On appeal, Xiong seeks reversal of his convictions and a new trial based on the district court's admission of expert testimony offered by a medical examiner and a firearms examiner. As to both, Xiong argues that the testimony was erroneously admitted because it improperly intruded on the fact-finding role of the jury. Xiong, who did not object to the testimony at trial, argues that admission of the testimony was plain error affecting his substantial rights. Our careful review of the record establishes that the district court did not err. We, therefore, affirm Xiong's conviction.

## I.

Youa Ty Lor, a car enthusiast who had recently moved with his family from Pennsylvania to Minnesota, decided to sell his Nissan 350Z in order to obtain money to start an auto-repair business. Lor asked his wife to post an advertisement on Craigslist for the car, which he stored in a friend's garage. The advertisement listed several modifications that had been made to the car and itemized the cost of each modification. When Xiong saw the Craigslist advertisement, he decided to steal the car. The car's twin turbo engine was of particular interest to Xiong. Xiong planned to strip Lor's car and use the parts in a Nissan 350Z that Xiong already owned.

On September 6, 2010, Xiong sent several text messages to his friend, Keng Thao. In those messages, Xiong asked about removing a twin turbo engine. After answering Xiong's questions, Thao inquired by text message, "y u asking, got somethin in mind?" Xiong replied, "Yeah. Stealing a turboed z and stripping it and putting the stuff in mines." Thao asked, "lol, haha where u gonna find a turbo z n how u gonna take it?" "Dont worry bout that. U wanna help? lol," Xiong responded. Thao's reply stated: "after we get me my winter tires lol." The two men continued to exchange text messages about when they planned to "do mines," apparently referring to the two schemes—getting winter tires for Thao and stealing and stripping the "turbo z" for Xiong.

Xiong purchased a prepaid cell phone on September 7, 2010. That same day, he sent another message from his personal phone to Thao, asking "U wanna kill a guy with me?" Thao responded, "just let me know lol." Xiong called Lor that evening from the prepaid cell phone. The next day, Xiong and Thao met Lor at the home of Lor's friend. They looked at Lor's Nissan 350Z, which he stored at that location. That evening, Xiong sent a text message to Thao advising, "Imma do it bro."

Xiong next contacted Lor on September 9, 2010, again using the prepaid cell phone. Xiong met Lor at the location where the Nissan 350Z was stored. This time Xiong went alone and brought a .40 caliber semi-automatic handgun. Xiong told Lor that he wanted to buy the car, but he did not have the purchase money with him. Xiong wanted to test drive the vehicle. If he liked it, Xiong proposed, they could go to his house where he would retrieve the money and pay for the car. Lor first drove Xiong to an auto shop where Lor

worked so that Lor could show Xiong additional items available for sale with the car. When Xiong and Lor left the auto shop in the 350Z, Xiong drove east on Highway 36. After driving for some time, as a ploy to get Lor out of the car, Xiong asked Lor if he heard a "rubbing noise." Xiong pulled over and parked the car on the right shoulder of the road, and the two men left the car to determine the source of the noise.

After discussing the car, Xiong claimed he had to relieve himself. Xiong fabricated this excuse to create the opportunity to move the gun from his jacket to his pants pocket. Xiong next asked to use Lor's cell phone and pretended to call Driver and Vehicle Services about the title to the car. Then Xiong pulled the gun on Lor. In his later statement to the police, Xiong gave two explanations—he fired the gun accidentally and the gun just "went off." Lor suffered a single gunshot wound to the abdomen.

Leaving Lor on the side of the road, Xiong drove Lor's Nissan 350Z away from the scene. Xiong discarded his prepaid cell phone and Lor's cell phone on the road as he fled. When Xiong reached his house, he pulled the car into the garage and, shortly thereafter, stripped the car for parts with the help of Thao and another person. Xiong also spray painted the unique features of the car to avoid detection. Xiong and Thao subsequently abandoned the car in Sunfish Lake Park where Xiong discarded the keys in a wooded area. Xiong and Thao never removed the twin turbo engine from Lor's 350Z, because the engine was too hot to remove during the time available to work on the car.

Shortly after the shooting, Lor was discovered lying on the roadside by passersby, two of whom were off-duty Minneapolis police officers. Officer Dennis Kreft performed chest compressions on Lor while Officer Lance DuPaul called 911. Lor was alive when he was placed in an ambulance to be transported to Regions Hospital. He died shortly thereafter.

After investigators discovered evidence linking Xiong to the crime, Xiong was arrested, advised of his constitutional rights with a *Miranda* warning, and interviewed by Special Agent Scott Mueller and Detective Marc Lombardi. Xiong's statements to Agent Mueller and Detective Lombardi were inconsistent. First, Xiong said that he planned to test drive the car on back roads so that he could steal it, and he decided to use the gun only to scare Lor. Xiong explained that he pointed the gun near Lor's abdomen and, when he "looked up, it went off." But Xiong also stated that he "didn't want [to] point [the gun]," and he "didn't wanna shoot [Lor] in general." Xiong admitted, however, that he thought he had killed Lor. When asked the reason he thought that he had killed Lor, Xiong replied "History." He then explained that "stomach wounds are . . . hard to fix, hard to heal." But Xiong denied that he pointed the gun at Lor's stomach for that reason. He said he was thinking that "a safe spot was his legs. Maybe his upper thigh. But the second [he] decided to do it, [he] got nervous. So [he] pointed the gun, [he] just pointed it, whipped it out real fast, not sure where the bullet would go."

On October 7, 2010, a Washington County grand jury returned an indictment, charging Xiong with one count of first-degree premeditated murder, a violation of Minn.Stat. § 609.185(a)(1), and one count of second-degree intentional murder, a violation of Minn.Stat. § 609.19, subd. 1(1). The case proceeded to trial on both charges.

Ramsey County assistant medical examiner Dr. Victor Froloff, who had performed an autopsy on Lor, testified at trial. After

describing his examination to the jury, Dr. Froloff opined that the cause of Lor's death was "exsanguination"—bleeding to death—from the gunshot wound. Without objection, the prosecutor asked Dr. Froloff, "What's the manner of death?" Dr. Froloff responded that, in his opinion, the "manner of death is homicide." On cross-examination, Xiong's counsel asked Dr. Froloff, "How many different manners of death do you medical examiners use?" Dr. Froloff responded, "We use, in general, four plus one manners of death. We classify death as a natural when people die natural; accidents; next one suicide, homicide. When we don't know, which [it] could be, for example, accident versus suicide, we can use undetermined. So basically five manners of death."

Forensic firearms examiner Kurt Moline testified at trial about his examination of the murder weapon. Moline testified that the gun was equipped with only a passive safety mechanism in the form of a striker block, which prevents the gun's firing pin from moving until the trigger is pulled. Because a striker block is entirely internal, it cannot be manually operated. Moline explained the testing that he performed on the firearm to determine whether the striker block was functioning properly. During this testing, Moline administered various blows and jars to the gun to determine whether he could cause the firearm to discharge without pulling the trigger. Moline's testing did not cause the firearm to discharge. Moline concluded from his testing that the striker block safety mechanism was mechanically sound.

Moline also tested the gun's "trigger pull," which refers to the amount of force required to pull the trigger and fire the gun. The standard trigger pull for the type of firearm used in the shooting was 6.5 to 7.5 pounds. But Xiong's firearm had a lower trigger pull of approximately 5 to 5.5 pounds. Near the end of Moline's direct examination, he testified that based on his examination of the firearm it could only be discharged by pulling or pressing the trigger.

At the close of trial, the district court instructed the jury on the elements of first-degree premeditated murder and second-degree intentional murder. In response to Xiong's request for an instruction on the lesser-included offense, the district court also instructed the jury on second-degree unintentional murder while committing a felony. The jury returned a guilty verdict on each of the three offenses. The district court imposed a sentence of life in prison without the possibility of parole for the first-degree premeditated murder conviction.

## II.

■ For the first time on appeal, Xiong objects to aspects of Dr. Froloff's testimony and Moline's testimony. We apply the plain-error standard of review to claims of unobjected-to error. Minn. R.Crim. P. 31.02; *State v. Sontoya*, 788 N.W.2d 868, 872 (Minn.2010); *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). When the alleged error does not implicate prosecutorial misconduct, an appellant has the burden of proving (1) an error, (2) that the error is plain, and (3) that the plain error affects substantial rights. *Griller*, 583 N.W.2d at 740 (citing *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)). If these three plain-error requirements are established, we assess whether the error must be addressed to ensure the fairness and integrity of the judicial proceedings. *Id.*

■ The alleged errors at issue here involve the admission of expert testimony. The decision to admit expert testimony generally rests within the sound discretion of the district court. *State v. Bradford*,

618 N.W.2d 782, 793 (Minn.2000). An expert may testify "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Minn. R. Evid. 702. Testimony generally is admissible under Rule 702 if it is helpful to the trier of fact. *Bradford*, 618 N.W.2d at 793. "An expert opinion is helpful if 'the members of the jury, having the knowledge and general experience common to every member of the community, would be aided in the consideration of the issues by the offered testimony.'" *Id.* (quoting *Clark v. Rental Equip. Co., Inc.*, 300 Minn. 420, 428, 220 N.W.2d 507, 512 (1974)). The facts or information on which "an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." Minn. R. Evid. 703(a).

An expert may testify as to an opinion or inference even if it "embraces an ultimate issue to be decided by the trier of fact." Minn. R. Evid. 704. But an expert may not offer an opinion as to a legal issue or a mixed question of law and fact. *State v. Chambers*, 507 N.W.2d 237, 238 (Minn.1993). An expert's opinion as to a criminal defendant's intent involves a mixed question of law and fact and, therefore, is inadmissible. *Id.* at 239.

A.

We first consider Xiong's claim of error regarding the testimony of Dr. Froloff. Xiong argues that the district court committed plain error by permitting Dr. Froloff to testify that the manner of Lor's death was homicide because this testimony was not helpful to the jury. In support of his argument, Xiong cites *Hestad v. Pennsylvania Life Ins. Co.*, 295 Minn. 306, 204 N.W.2d 433 (1973). In *Hestad*, we affirmed the district court's exclusion of a deputy coroner's testimony that the dece-

dent's manner of death was suicide and not an accident. *Id.* at 310, 204 N.W.2d at 436. We reasoned that because the deputy coroner did not have any knowledge superior to that of the jury regarding the decedent's state of mind, the deputy coroner was not qualified to testify on the subject. *Id.* Here, Xiong argues that, like the medical examiner in *Hestad*, Dr. Froloff was not qualified to testify regarding Xiong's state of mind. Because Dr. Froloff had an incomplete "picture of the circumstances surrounding Lor's death," Xiong argues, the jury was in the better position to decide whether he killed Lor intentionally or accidentally.

Xiong also contends that Dr. Froloff's testimony that Lor's manner of death was homicide was admitted erroneously because such testimony involved an expert's inference of intent. The error was "compounded," Xiong asserts, by Dr. Froloff's failure to define the term "homicide" and by Dr. Froloff's reference to another manner of death as "accidental." In support of his argument, Xiong relies on *State v. Chambers*, 507 N.W.2d 237 (Minn.1993). In *Chambers*, the defendant challenged his conviction of second-degree intentional murder after the pathologist testified, over defense counsel's objection, that he believed with "reasonable medical certainty" that the wounds inflicted "'were meant to cause the subject's death.'" *Id.* at 238. We concluded that the pathologist's testimony did not prejudice the defendant. *Id.* at 239. But we emphasized it is nonetheless error for an expert to testify regarding a mixed question of law and fact, such as whether the defendant possessed the requisite mens rea for the charged offense. *Id.*

Xiong's argument challenging the admissibility of Dr. Froloff's testimony that the manner of Lor's death was homicide is unavailing. Xiong concedes that because a

definition of homicide was not offered at trial, the jury was required to apply the common usage of the term "homicide"— namely, "[t]he killing of one person by another." *American Heritage Dictionary* 841 (4th ed.2000); *Black's Law Dictionary* 802 (9th ed.2009). The testimony that Lor's manner of death was homicide, therefore, cannot be construed to mean that Xiong committed intentional murder. Indeed, murder is a form of criminal homicide that can be intentional or unintentional. *Black's Law Dictionary* 802–03 (9th ed.2009) (defining criminal homicide as "[h]omicide prohibited and punishable by law, such as murder or manslaughter" or "[t]he act of purposely, knowingly, recklessly, or negligently causing the death of another human being."); *cf. Black's Law Dictionary* 803 (9th ed.2009) (defining "excusable homicide," "innocent homicide," and "justifiable homicide"). In light of the common usage of the term "homicide," Dr. Froloff's use of the term did not even imply that a crime had occurred, much less an intentional crime, because the term "homicide" can describe both criminal and non-criminal conduct. *See id.*[1]

Likewise, the testimony elicited by defense counsel that another manner of death is "accident" does not make Dr. Froloff's use of the term "homicide" inadmissible. In *State v. Langley,* we rejected a similar argument, stating that "[i]n Minnesota, the law has long been that medical experts are permitted to give their opinions upon the very issue which the jury will have to decide." 354 N.W.2d 389, 401 (Minn.1984), *abrogated on other grounds by State v. Her,* 781 N.W.2d 869 (Minn.2010). We reasoned that it is a forensic pathologist's professional respon-

sibility "to determine cause and manner of death based upon the condition of the body as well as the surrounding circumstances." *Id.* Similarly, in *State v. Bradford,* we concluded that no error was committed when the district court admitted a medical examiner's expert testimony that, based on his autopsy of the victim's body, the victim's manner of death was homicide rather than suicide. 618 N.W.2d 782, 793 (Minn.2000). Distinguishing the expert testimony in *Chambers,* we concluded in *Bradford* that the medical examiner's testimony was "helpful to the jury because a lay juror may not be able to differentiate between a self-inflicted intraoral gunshot wound and one inflicted by another." *Id.*

Here, the district court properly admitted Dr. Froloff's testimony that the manner of Lor's death was homicide. The testimony was helpful to the jury; and it did not constitute improper expert testimony regarding Xiong's intent. Dr. Froloff's testimony assisted the jury's understanding of the medical evidence offered at trial by explaining that the autopsy results were consistent with homicide. Contrary to the expert's opinion in *Hestad,* in which the expert spoke only with the sheriff and performed a cursory examination of the scene, 295 Minn. at 310, 204 N.W.2d at 436, Dr. Froloff's testimony as to Lor's manner of death was based on Dr. Froloff's examination of Lor's body. Moreover, the scope of *Hestad*'s holding is limited by our decisions in *Bradford* and *Langley,* both of which establish that expert testimony regarding the victim's manner of death can be helpful to the jury. *Bradford,* 618 N.W.2d at 793; *Langley,* 354 N.W.2d at 401.

---

1. Under Minnesota law, there is no crime of "homicide." The term "homicide" is used in the headnote before the sections of chapter 609 governing first-, second-, and third-degree murder, and first- and second-degree manslaughter. But use of the term "homicide" in the headnote does not make it part of the statute. Minn.Stat. § 645.49 (2012). The term "homicide" is not used in the text of any of the statutes at issue here.

In sum, Dr. Froloff's testimony that Lor's manner of death was "homicide" did not involve an expert inference as to Xiong's intent, and it was otherwise helpful to the jury. Because we conclude that the admission of this testimony was not erroneous, we need not address the other factors of the plain-error test. *State v. Kuhlmann,* 806 N.W.2d 844, 853 (Minn.2011).

**B.**

We next examine Xiong's claim that aspects of firearms examiner Kurt Moline's testimony constitute reversible error. For the first time on appeal, Xiong objects to the following portion of Moline's testimony:

> Q. Mr. Moline, based on the work that you did in this case, specifically the work that you did on the firearm, your inspection, your analysis, in your professional opinion is there anything about this firearm that would suggest to you that it could be discharge[d] accidently?
>
> A. No.
>
> Q. Is it fair to say that the only way that this firearm can be discharged is by pulling the trigger?
>
> A. Yes. By something, you know, a finger or something else pressing or pulling the trigger.

Xiong argues that Moline "went too far when he concluded that [the gun] could never accidently fire" for three reasons. First, Moline did not recreate the actions taken at the scene of this crime. Second, "it is not possible for [Moline] to determine that a gun could never accidentally fire." Third, Moline's testimony that the gun could not have been "discharge[d] accidentally" is a legal conclusion that was not helpful to the jury.

We are not persuaded. First, although Xiong characterizes Moline's testimony as stating that Xiong's gun could "never accidentally fire," the record simply does not support Xiong's characterization of Moline's testimony. In addition, Moline described the tests he performed on the gun to determine whether the gun would fire in response to a blow or a jar to it. Moline also described the trigger-pull testing he performed on the murder weapon and the amount of force required to fire it. Moline's conclusions were based on the tests he conducted and the analysis he performed as contemplated in Minn. R. Evid. 703(a). Moline never asserted that he was attempting to recreate the scene,[2] and the evidence was probative and helpful to the jury.

■ Xiong asserts that Moline's statements amounted to legal analysis. Xiong's

**2.** Xiong cites *State v. Nystrom,* 596 N.W.2d 256 (Minn.1999) to support his argument. In *Nystrom,* we affirmed the district court's exclusion of expert testimony that high crime rates in north Minneapolis made it reasonable for young people in that community to "make a preemptive strike and kill any person who caused him ... fear." *Id.* at 260. The defendant sought to introduce the expert testimony to support his claim of self-defense. We reasoned that "[t]he absence of some evidence tying the expert's proposed testimony to the appellant takes from the jury 'responsibility for judging credibility and the facts' with respect to the determination of whether appellant's actions were reasonable." *Id.* (quoting *State v. Grecinger,* 569 N.W.2d 189, 193 (Minn.1997)). We agreed with the district court's conclusion that such evidence was irrelevant because it provided a general theory, rather than one that properly reflected the law regarding self-defense, and it did not directly address the appellant and the particular circumstances involved. *Id.* Our reasoning in *Nystrom* was based in large part on the specific purpose for which the evidence was offered in support of the defendant's self-defense claim. Xiong cites *Nystrom* without any explanation of its applicability to the case before us. Our decision in *Nystrom* does not provide a basis to conclude that Moline's testimony was inadmissible.

argument suggests that Moline's testimony involved an expert inference regarding Xiong's intent. Xiong argues that his defense "was that he got nervous when he pulled out the gun to rob Lor, the gun slipped, and he inadvertently pulled the trigger while attempting to regain control of the gun." But our review of Xiong's statement to police, which was videorecorded and shown to the jury, and our review of defense counsel's arguments at trial establish that Xiong's recorded statements and his counsel's arguments present two different theories of the shooting.

The first defense theory was a trigger-pull theory in which Xiong unintentionally pulled the trigger when fumbling with the gun. For example, when first describing the events to the police, Xiong stated that he fired the gun but that he did not mean to shoot. Xiong also stated that, when he pulled the gun, "the gun was falling then [his finger] caught out [sic] the trigger." The second defense theory was a misfire theory in which the gun discharged or misfired when Xiong was fumbling with it. For example, during the police questioning, Xiong also stated that he "pulled out the weapon. And then it went off." Xiong also maintained that he thought he pointed the gun near Lor's abdomen and when Xiong "looked up, it went off."

Like Xiong's statements to police, his counsel's arguments at trial suggest both a misfire theory and a trigger-pull theory. For example, early in his closing argument, Xiong's counsel described the course of events as follows: "When defendant pulled out the gun, whipped out the gun, he lost grip of it and it went off because he was nervous." Xiong's counsel paraphrased Xiong's statements to police as: "I didn't mean to shoot at all. When I looked up the gun went off." But during other parts of the closing argument, Xiong's counsel advanced a trigger-pull theory. For example, he argued that Xiong "pulled the trigger" and that Xiong "got nervous and his hand got caught in the trigger of the gun." The State's rebuttal to Xiong's closing arguments addressed both theories advanced by the defense.

When Moline's expert testimony is considered in its entirety and in the context of the two theories advanced by Xiong, it is evident that Moline's professional opinion was offered to address Xiong's misfire theory. Moline's testimony provided the jury with an expert opinion about the gun's condition that was based on his testing and analysis. In Moline's expert opinion, Xiong's gun was mechanically sound and could not be discharged accidentally or misfire because of jarring or a blow to the gun. Moline's testimony, which did not draw an objection, properly addressed an issue of fact rather than one of law. Although Moline's testimony was offered to support an inference that Xiong acted with the requisite intent by countering Xiong's misfire theory, this testimony did not constitute an expert opinion as to Xiong's intent. The district court's admission of Moline's testimony, therefore, was legally sound. In light of this conclusion, we need not address the other factors of the plain-error test. *Kuhlmann*, 806 N.W.2d at 853.

In sum, the district court properly admitted the expert testimony of the medical examiner and the firearms examiner that Xiong challenges in this appeal.

Affirmed.