WATERMAN, Justice
(concurring in part and dissenting in part).
I respectfully concur in part IV and dissent from part III of the majority opinion. The majority correctly concludes the district court properly denied Tyler’s motion to suppress her confessions that she drowned her baby in the bathtub. Yet, the majority erroneously concludes the district court abused its discretion by allowing the medical examiner to testify as to the cause and manner of death because he relied on the same voluntary confessions the jury was allowed to hear. Medical experts testifying in our courts routinely rely on patient histories. Medical examiners such as Dr. Thompson are no different. The medical examiner has a statutory duty to investigate and determine the cause and manner of the suspicious death of a child. Iowa Code § 331.802(2)(a) (2015). Why fault Dr. Thompson for considering the mother’s own incriminating statements as to how she killed her baby?
The majority breaks from long-standing Iowa law liberally allowing expert testimony, including testimony based on witness statements or patient histories. The majority acknowledges that “we have been committed to a liberal view on the admissibility of expert testimony.” Remes v. Adams Labs., Inc., 778 N.W.2d 677, 685 (Iowa 2010). Indeed, Iowa courts have been committed to a liberal standard for over seventy years. See Grismore v. Con-sol. Prods. Co., 232 Iowa 328, 343, 5 N.W.2d 646, 655 (1942) (“The modern tendency of the courts everywhere is to take a more liberal and rational view respecting the admissibility and scope of [expert] testimony.”); see also Leaf v. Goodyear Tire & Rubber Co., 590 N.W.2d 525, 530-31 (Iowa 1999) (noting the “expansive scope” of expert testimony under Iowa R. Evid. 5.702). In my view, we should continue to trust our adversary system to expose weaknesses in an expert’s opinions and trust our juries to give appropriate weight to expert testimony in this case and generally. The majority’s opinion will inevitably lead to the exclusion of a wide variety of expert opinion testimony based on witness accounts.
The majority opinion rests on a false premise — that Dr. Thompson based his opinion as to the cause (drowning) and manner (homicide) of death solely on Tyler’s statements to the police. To the contrary, his testimony confirms he based his opinions on his autopsy findings, lab reports, and the physical evidence at the crime scene as well as Tyler’s confession. Dr. Thompson conducted a thorough physical examination of the deceased infant and sent organs to three outside specialists for testing. Through his own investigation, he was able to rule out congenital defects, substance abuse, infections, and skeletal trauma as alternate causes of death. He explained what he relied on to determine the infant’s cause of death was drowning:
Q. Do you have an opinion as to a reasonable degree of medical certainty regarding the cause of death in this case? A. Yes, I do.
Q. And what is it? A. The cause of death is drowning.
Q. And what do you base your opinion on? A. My opinion is based on a combination of history, which includes scene findings, it includes witness statements; it’s also based on a combination of physical exam, which is my autopsy findings; and then supplemental testing.
*188 Q. Supplemental testing, for example, when you sent certain organs to a specialist to examine; is that correct? A. Supplemental lab testing would be x-rays, microbiology, metabolic studies.
Q. Okay. Toxicology? A. Toxicology.
Dr. Thompson also explained how he determined the manner of death was homicide:
Q. What is your opinion based on? A. Just like cause of death, my manner of death opinion is based on history, again, scene findings, witness statements; it’s based on a physical exam, or the autopsy; and then supplemental lab testing.
Dr. Thompson’s autopsy findings corroborated Tyler’s confession that her baby was born alive, moved, cried, and took some breaths before being drowned in bathwater. Dr. Thompson testified that there Was fluid that could be bathwater in the baby’s lungs consistent with drowning. Secondly, he testified that the expanded alveoli, in Baby Tyler’s lungs indicate the infant was probably born alive:
Q. In this case, is there any evidence that this baby took a breath? A. There could be, yes.
Q. Explain, that, please. A. When I looked under the microscope, the— there’s a structure in the lungs called alveoli, which are a grape-like structure. Some of those structures were expanded, which could be consistent with Baby Tyler taking a few breaths.
[[Image here]]
Q. Do you have an opinion to a reasonable degree of medical certainty as to what that [partially expanded alveoli] indicates to you? A. Given the history that Baby Tyler cried and moved, to me that suggests that Baby Tyler probably took a few breaths.
The majority recognizes that “in making these determinations [about cause and manner of death], medical examiners routinely rely on the circumstances that surround the death, as revealed by independent investigation, police investigation, and eyewitness accounts.” (Emphasis added.) I agree. As Dr. Thompson testified:
Q. In your role as a medical examiner, how do these witness statements and your knowledge of the scene, how important is that in determining a diagnosis of manner and cause of death? A. Uh, it’s vital.
Q. And explain that, please. A. Um, so I’m a physician first. Um, as I’ve been saying, my diagnosis, which we call cause of death, is based on history, physical exam, and then supplemental lab testing. Um, if I just did the physical exam, I would miss a significant number of cause and manner of death. It would be similar to you going to your primary care physician, sitting down on his exam table and just having — have him start listening to your lungs, looking in your ears, checking your eyes without him asking you what’s wrong. I can’t obviously ask my patients what’s wrong with them, so I have to ask other people what’s wrong. I have to ask police what’s wrong. Sometimes witnesses will come forward and say what’s wrong or what happened. So that part of my diagnosis or cause of death, the history, is absolutely essential.
[[Image here]]
So in every single case that I do, it’s always history, physical exam, and lab tests, just like when you go see your physician.
It is well established that physicians may rely on self-reported patient histories. See, e.g., Walker v. Soo Line R.R., 208 F.3d 581, 586 (7th Cir.2000) (“Medical pro *189 fessionals reasonably may be expected to rely on self-reported patient histories. Such histories provide information upon which physicians may, and at times must, rely in their diagnostic work.” (Citation omitted.)). This applies equally to medical examiners who must determine the cause and manner of death. See Baraka v. Commonwealth, 194 S.W.3d 313, 315 (Ky.2006) (“Indeed, the facts and data in this case, information regarding the circumstances of the victim’s death provided by investigating officers, is exactly the kind of information customarily relied upon in the day-today decisions attendant to a medical examiner’s profession.”); Rollins v. State, 392 Md. 455, 897 A.2d 821, 851 (2006) (“[W]e disagree with [the] contention that [an expert] relied upon improper information to render her expert opinion. [The expert’s] consideration of the medical examiner’s file in its entirety was proper. She testified that a review of all aspects of the file, including the criminal investigation, was necessary to form her opinion and was the accepted practice in her field.”), abrogated on other grounds as recognized by Derr v. State, 422 Md. 211, 29 A.3d 533, 549 (2011); State v. Wilson, 149 N.M. 273, 248 P.3d 315, 324-25 (2010) (allowing a forensic pathologist to “consider evidence beyond the medical record” in forming his medical opinion), overruled on other grounds by State v. Tollardo, 275 P.3d 110, 121 (N.M. 2012); State v. Commander, 396 S.C. 254, 721 S.E.2d 413, 420 (2011) (“Because the anecdotal history is an essential component of any autopsy, we find testimony concerning findings based on this information falls within the umbrella of the expert’s specialized knowledge.”); State v. Boyer, 741 N.W.2d 749, 757 (S.D.2007) (“Although [the medical examiner] considered extrinsic information in reaching his opinion, he further explained that receiving extrinsic evidence was widely accepted in the medical field....”); State v. Tucker, 96 P.3d 368, 371 (Utah Ct.App.2004) (“[The expert] testified that medical examiners regularly rely upon investigative information when forming their opinions. This practice is also supported in case law throughout the United States that examines this issue.”).
These courts agree that medical examiners may rely on disputed witness testimony, with cross-examination as the proper tool to explore weaknesses in the opinions. See Walker, 208 F.3d at 586 (“In situations in which a medical expert has relied upon a patient’s self-reported history and that history is found to be inaccurate, district courts usually should allow those inaccuracies in that history to be explored through cross-examination.”); Baraka, 194 S.W.3d at 315 (“It has been long held that such underlying factual assumptions are properly left for scrutiny during cross-examination.”); Rollins, 897 A.2d at 853 (“All experts ... were subject to cross-examination about their findings; once the experts’ opinions were admitted, it was within the province of the trier of fact to determine which expert should be believed.”); Wilson, 248 P.3d at 325 (“Defendant was free to persuade the jury that [the expert’s] opinion relied too much on a questionable confession and not enough on hard science. The jury remained the ultimate arbiter of [the expert’s] credibility, and it was free to reject his opinion and conclude that [the victim’s] death was caused by natural causes.”).
Dr. Thompson was vigorously cross-examined and conceded his autopsy findings could also be consistent with a stillborn child with amniotic fluid in the lungs and alveoli expanded by gases released after death. He acknowledged he was unable to determine the cause and manner of death until viewing Tyler’s confession. These weaknesses go to the weight of his opinion testimony, not its admissibility. See *190 Williams v. Hedican, 561 N.W.2d 817, 823 (Iowa 1997) (“ ‘ “[A]n expert’s lack of absolute certainty goes to the weight of this testimony, not to its admissibility.” ’ ” (alteration in original) (quoting State v. Bullet, 517 N.W.2d 711, 713 (Iowa 1994))); Hutchison v. Am. Family Mut. Ins. Co., 514 N.W.2d 882, 888 (Iowa 1994) (“[W]e believe with the aid of vigorous cross examination, the jury is fully capable of detecting the most plausible explanation of events.”).
The cases the majority relies on are distinguishable. In People v. Eberle, an appellate court held the trial court erred by denying the defendant’s motions to suppress the statements relied on by the medical examiner. 265 A.D.2d 881, 697 N.Y.S.2d 218, 219-20 (1999). The medical examiner’s opinion that an infant’s death was “homicidal suffocation” rather than Sudden Infant Death Syndrome (SIDS) was based on the statements alone, not any “medical evidence.” Id. at 219. The statements, obtained in violation of defendant’s right to counsel, were the fruit of the poisonous tree. Id. at 219-20. The suppression remedy would be empty if the jury nevertheless heard the inadmissible statements through the medical examiner. By contrast, the majority correctly holds Tyler’s confessions were properly admitted into evidence. Dr. Thompson was entitled to rely on the same confessions the jury heard, in addition to the medical evidence (his autopsy findings) that corroborated Tyler’s self-incriminating statements to police.
The majority relies on other cases that did not involve a medical examiner relying on the defendant’s confession. In State v. Vining, the medical examiner testified that “none” of the physical evidence supported her opinion that the fatal head injury “was caused at the hands of another as opposed to an accidental fall.” 645 A.2d 20, 21 n. 1 (Me.1994). Dr. Thompson, however, testified that his opinion was supported by the physical findings of his autopsy, lab tests, and physical evidence at the crime scene, as well as Tyler’s confessions, and explained how the forensic evidence corroborated her history of the drowning death. In Maxwell v. State, the medical examiner was unable to determine the cause of death from his autopsy, and his opinion that the manner of death was homicide “was based entirely upon the circumstances surrounding Gina Maxwell’s demise as related to him by a detective working on the case.” 262 Ga. 73, 414 S.E.2d 470, 473-74 (1992), overruled on other grounds by Wall v. State, 269 Ga. 506, 500 S.E.2d 904, 907 (1998). The medical examiner “admitted that his opinion as to the manner of death ‘[was] based on things the jury could determine themselves.’ ” Id. at 474 (alteration in original). That is not so in this case. The jury needed expert medical testimony to explain the significance of the fluid found in the infant’s lungs and the partially expanded alveoli. Nor does State v. Jamerson help the majority. 153 N.J. 318, 708 A.2d 1183 (1998). The medical examiner-in that case strayed outside his zone of medical competence by acting as an accident reconstruetionist in determining the defendant drove recklessly. See id. at 1194-95. By contrast, Dr. Thompson simply did what medical examiners are trained to do.
Other cases cited by the majority conclude the use of the word “homicide” implies criminal guilt or intent, and prohibit medical examiners from testifying on that basis. State v. Sosnowicz, 229 Ariz. 90, 270 P.3d 917, 922 (Ct.App.2012) (“[The ex-pertas testimony that the victim died as the result of a ‘homicide’ went to the key issue in the case: Did defendant intentionally, knowingly or recklessly cause the victim’s death by a criminal act or was the victim’s death the result of a non-criminal *191 accident?”); People v. Perry, 229 Ill. App.3d 29, 170 Ill.Dec. 823, 593 N.E.2d 712, 716 (1992) (“In fact, it might be construed as prejudicial, since a layperson might equate the word homicide with murder.”); Eberle, 697 N.Y.S.2d at 219 (“Moreover, the expert’s statement that the infant died from ‘homicidal’ suffocation improperly states a conclusion regarding defendant’s intent.”); Bond v. Commonwealth, 226 Va. 534, 311 S.E.2d 769, 771-72 (1984) (finding medical examiner imper-missibly testified to an ultimate issue of fact — death by homicide). These cases are inapposite because Dr. Thompson testified that “homicide,” as used in his report, is a neutral medical term:
Q. And in this case, did you form an opinion to a reasonable degree of medical certainty regarding manner of death? A. Yes, I did.
Q. And what is your opinion? A. In the manner of death is homicide.
Q. And what does that mean? Homicide. A. Homicide is a medical term. It’s a neutral term. It doesn’t signify right or wrong. It simply means death at the hands of another individual.
Such explanatory testimony is lacking in the foregoing cases relied upon by the majority. Tyler does not challenge the jury instructions given in this ease, which correctly set forth the elements of the crimes charged. The district court properly allowed Dr. Thompson to testify regarding the medical definition of homicide.
The majority inaccurately refers to Tyler’s confessions as “uncorroborated.” To the contrary, the police investigation and Dr. Thompson’s medical investigation corroborate key factual statements in her confessions. During Tyler’s first police interview, she described giving birth while standing up, which is corroborated by a bruise noted in the autopsy on Baby Tyler’s forehead where he hit the floor of the bathroom. The police found key physical evidence — the placenta and the scissors used to cut the exposed umbilical cord— exactly where Tyler said she put them. Most importantly, Dr. Thompson’s autopsy findings of fluid in the infant’s lungs and expanded alveoli corroborate her description of how she filled the tub with water and placed Baby Tyler, born alive, face down in the bathwater to drown. Dr. Thompson’s medical evaluation of Baby Tyler corroborated Tyler’s confession. See State v. Polly, 657 N.W.2d 462, 467 (Iowa 2003) (“ ‘Corroboration need not be strong nor need it go to the whole case so long as it confirms some material fact connecting the defendant with the crime.’” (quoting State v. Liggins, 524 N.W.2d 181, 187 (Iowa 1994))).
Dr. Thompson did not merely parrot Tyler’s confession to the jury; he considered her account in the context of his medical conclusions from the autopsy and lab tests. Dr. Thompson admittedly could not determine the cause and manner of death without Tyler’s confession. That does not mean his opinion rests on her confession alone. As medical examiners routinely do, he relied on his autopsy findings, lab test results, and physical evidence as well as the history provided by the only person present at the time of the baby’s death. I would not exclude testimony of medical witnesses because they necessarily rely on the history provided by family members present at the time of death.
I disagree with the majority’s conclusion that “Dr. Thompson’s opinions were inadmissible because they amounted to an impermissible comment on Tyler’s credibility.” The majority relies on State v. Dudley in which we concluded the prosecution’s expert improperly vouched for the credibility of the child sex-abuse victim, not the defendant. 856 N.W.2d 668, 676-77 (Iowa 2014). Such precedent is in *192 applicable to expert testimony relying in part on an adult defendant’s voluntary confession to establish the factual cause and manner of death. None of our court’s precedent that culminated in Dudley involved a defendant arguing the state’s expert improperly vouched for the defendant’s credibility. Tyler, who did not testify at trial, is complaining Dr. Thompson “vouched for” what Tyler herself told police. This is a far cry from Dudley, which involved a “he-said, she-said” swearing contest that turned on whether the jury believed Dudley (who denied abusing the victim), or the child victim (who said Dudley abused her). The state could gain an unfair advantage through expert testimony introduced to bolster the credibility of a victim testifying against the defendant. See id. That concern is not implicated when an expert relies on the defendant’s own words as to what happened.[21]
Significantly, Dr. Thompson never commented on Tyler’s credibility, state of mind, or guilt in the presence of the jury. He gave no opinion as to her motive or intent. He simply relied, in part, on her confessions for determining the physical cause and manner of death. As the majority recognizes, the term “homicide” as used by medical examiners such as Dr. Thompson “expresses no opinion as to the criminality of the killing or the culpability of the killer.” A medical examiner testifying that the manner of death is homicide is rendering a neutral medical opinion, one required by statute. See Iowa Code § 331.802(2)(<x) (“[T]he county medical examiner shall conduct a preliminary investigation of the cause and manner of death, prepare a written report of the findings, ... and submit a copy of the report to the county attorney.”). For a killing to be a crime, the requisite intent must be present. See id. §§ 707.1-.5. Intent, and therefore guilt or innocence, is for the jury to determine.
Most courts agree the expert medical examiner only crosses the line by testifying to the intent or guilt of the defendant. See Commander, 721 S.E.2d at 420 (“Of the many courts in other jurisdictions that have considered where to draw the line in these cases, we tend to agree with those courts that have found that expert testimony addressing the state of mind or guilt of the accused is inadmissible.”). Dr. Thompson did not cross this line. See id.; Willis v. State, 274 Ga. 699, 558 S.E.2d 393, 395 (2002) (“Because this testimony did not improperly invade the province of the jury on the ultimate issue of whether the death was an intentional killing or an accident, the trial court did not err.... ”); Baraka, 194 S.W.3d at 318 (“Accordingly, most jurisdictions ... hold that a qualified expert can express an opinion that the manner of a disputed death was homicide, ... though not that the homicide was intentional, wanton, reckless, or accidental, which would constitute an opinion as to the guilt or innocence of the defendant.”); Rollins, 897 A.2d at 851-52 (discussing how all expert testimony is designed to bolster one view of the facts, which does not invade the province of the jury); State v. Dao Xiong, 829 N.W.2d 391, 397 (Minn.2013) (“Here, the district court properly admitted [the expert’s] testimony that the manner of '[the victim’s] death was homi *193 cide.... [I]t did not constitute improper expert testimony regarding [the defendant’s] intent. [The expert’s] testimony assisted the jury’s understanding of the medical evidence offered at trial by explaining that the autopsy results were consistent with homicide.... [The expert’s] testimony as to [the victim’s] manner of death was based on [the expert’s] examination of [the victim’s] body.”); State v. Bradford, 618 N.W.2d 782, 793 (Minn.2000) (holding an examiner could testify to homicide as a manner of death, but not offer an opinion regarding intent); Boyer, 741 N.W.2d at 758 (“We finally note that neither expert usurped the function of the jury by testifying that [the victim] actually died as a result of being shaken or thrown down. Nor did the experts opine whether they thought [the defendant] was guilty.”); Tucker, 96 P.3d at 371 (“In light of [the expert’s] testimony that intent was not a factor in classifying [the victim’s] death, and that intent is a question for the jury, we see no error in the trial court’s rulings.”); State v. Richardson, 158 Vt. 635, 603 A.2d 378, 379 (1992) (“The testimony [that the manner of death was homicide] was not a comment on defendant’s guilt or innocence.”); State v. Scott, 206 W.Va. 158, 522 S.E.2d 626, 632 (1999) (“Because the term ‘homicide’ is neutral and pronounces no judgment, we do not find that [the expert] testifying that [the victim’s] manner of death was homicide removed any defense available to [the defendant]. In fact, [the expert] testified that his opinion was not a legal conclusion — -that he was neither trained nor qualified to render a legal conclusion concerning [the victim’s] death.”). I would follow these well-reasoned decisions. Medical examiners should be allowed to rely on witness accounts, including a defendant’s confession, in testifying the manner of death was homicide so long as they do not testify that the defendant is “guilty” or has criminal intent.
I fear today’s majority opinion will have unintended consequences. Going forward, will an accident reconstructionist be allowed to give opinions based on witness statements? May a forensic accountant rely on a defendant’s confession to embezzlement or consider deposition testimony to determine a spouse dissipated marital assets? May a human-factors expert rely on disputed testimony as to how an accident happened when opining on the efficacy of a warning or safety of a product design? May a hydrologist rely on disputed testimony or a party’s admissions to determine the source of groundwater contamination? May medical witnesses continue to rely on patient histories? After today’s decision, it appears such testimony could be excluded from evidence any time the expert admits his opinion depends on the witness’s account of what happened. This is an unwarranted and ill-advised sea change in our heretofore liberal approach to the admissibility of expert testimony.
We have routinely allowed expert testimony based on witness testimony or statements. Is the expert thereby indirectly vouching that the witness is telling the truth? Do these cases remain good law? See, e.g., In re Det. of Stenzel, 827 N.W.2d 690, 702 (Iowa 2013) (concluding expert testimony based on an interview with defendant and defendant’s criminal history was sufficient to show that defendant had “a mental abnormality and had serious difficulty controlling his behavior”); Leaf, 590 N.W.2d at 530 (affirming admissibility of expert’s opinion on product defect that depended on plaintiffs recollection of events); Olson v. Nieman’s, Ltd., 579 N.W.2d 299, 308 (Iowa 1998) (discussing how expert considered statements of a third party when determining if an invention meets the nonobvious requirement of *194 a patent); Johnson v. Knoxville Cmty. Sch. Dist., 570 N.W.2d 633, 639-40 (Iowa 1997) (discussing how expert relied on a two-hour interview, case documentation, and a family member’s journal detailing plaintiffs symptoms to support opinion that plaintiff suffered from obsessive compulsive disorder); State ex rel. Leas in re O’Neal, 303 N.W.2d 414, 417 (Iowa 1981) (permitting clinical psychologist acting as an expert witness to use psychological testing and interviews to determine that parents were psychologically unfit to care for a child).[22] These are just a few of the cases that could have gone the other way, had the majority’s opinion been the rule of law when they were decided.
The court of appeals concluded the error in admitting Dr. Thompson’s testimony was not harmless. Given Tyler’s confession, I am not so sure. Several decisions cited by the majority held it was harmless or nonprejudicial error to allow a medical examiner to testify that the death was a homicide. Sosnowicz, 270 P.3d at 925-26; Perry, 170 Ill.Dec. 823, 593 N.E.2d at 717. The dissent in Dudley concluded that the admission of the expert testimony in that case was harmless. 856 N.W.2d at 684-85 (Cady, C.J., dissenting). I would trust our juries to give the expert testimony proper weight.
The district court, relying on our traditional liberal approach to the admissibility of expert testimony, correctly denied Tyler’s motion to suppress Dr. Thompson’s testimony and autopsy report stating the cause and manner of Baby Tyler’s death. The district court properly equated Dr. Thompson’s reliance on Tyler’s confessions to “a physician relying on a patient’s history in reaching a diagnosis.” I would affirm Tyler’s conviction.
CADY, C.J., and MANSFIELD, J., join this concurrence in part and dissent in part.

. It is true Tyler initially denied her baby was born alive before confessing, twice, that it moved and cried and she drowned the infant in the bathwater. Yet, as the majority and district court correctly found, Tyler's confessions were voluntary. Why would she make up the story? There is no evidence Tyler was coerced or duped into confessing through a promise of leniency. Why preclude a medical expert from relying on confessions deemed reliable enough for the jury to hear?

. Decisions of the court of appeals would likewise be called into question by the majority’s decision. See, e.g., State v. Gilmore, No. 11-0858, 2012 WL 3589810, at *5-6 (Iowa Ct.App. Aug. 22, 2012) (allowing psychologist to consider defendant's interview to determine that defendant could form the specific intent to kill); State v. Favara, No. 02-1311, 2003 WL 21920959, at *1-2 (Iowa Ct.App. Aug. 13, 2003) (allowing sheriffs deputy to testify as an expert witness as to how he believed a burglary took place after he "investigated the crime scene, photographed and weighed the items, and conducted interviews”); In re Det. of Rafferty, No. 01-0397, 2002 WL 31113930, at *1 (Iowa Ct.App. Sept. 25, 2002) (concluding that expert could base his opinion that a person is a sexually violent predator and likely to reoffend on a clinical interview, official records, and actuarial assessment tools).